(No. 33972, 34027 Cons.—

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* JAMES KALPAK *et al.,* Plaintiffs in Error.

*Opinion filed January 24, 1957—Rehearing denied March 19, 1957.*

CHARLES A. BELLOWS, and JASON ERNEST BELLOWS, both of Chicago, for plaintiff in error James Kalpak, and GERALD W. GETTY, Public Defender, of Chicago, for plaintiff in error James E. Johnson.

LATHAM CASTLE, Attorney General, of Springfield, and JOHN GUTKNECHT, State's Attorney, of Chicago, (FRED G. LEACH, IRWIN D. BLOCH, JOHN T. GALLAGHER, RUDOLPH L. JANEGA, and WILLIAM L. CARLIN, of counsel,) for the People.

Mr. JUSTICE DAVIS delivered the opinion of the court:

The defendants, James Kalpak and James E. Johnson, were jointly indicted for the crime of abortion by the grand jury of Cook County. Each defendant made a motion for a separate trial, which was denied, and to suppress certain evidence which police officers allegedly obtained by an unlawful search and seizure. Johnson's motion involved certain articles taken from his home, in his absence and without a search warrant; Kalpak's involved certain papers taken from his person at the time of his arrest. The court held a preliminary hearing, at which evidence was submitted, and thereupon denied both motions. The defendants were jointly tried and the jury returned separate verdicts finding each guilty as charged. After overruling their motions for a new trial, the court sentenced Kalpak to serve a term of not less than one year nor more than two years, and Johnson not less than two years nor more than seven years in the Illinois State Penitentiary. Each defendant sued out a separate writ of error to this court and the cases were consolidated for review.

The errors assigned and argued are: (1) that the evidence fails to prove the defendants guilty of abortion; (2) that the trial court erred in admitting certain evidence; (3) that the trial court erred in refusing an instruction tendered by the defendants; and (4) that error was committed in denying the motions to suppress.

Five witnesses testified for the People, and in addition, the testimony of Bernice Lewis, R. Robbins, and Dr. T. B. Horrell was introduced by stipulation. The defendants did not testify and presented one medical witness. The testimony on the motions to suppress and at the trial was repetitive, and will be summarized along with the other evidence, much of which is undisputed.

The record discloses that Dolores Bogan, age 27, had sexual relations with an unnamed man in June of 1954 and missed her July menstrual period. On July 27, 1954,

she consulted her regular physician, Dr. John Kuzera, who advised her that she was pregnant. She was then in normal health, and Dr. Kuzera testified that an abortion was not necessary to preserve her life. After missing menstruation in August and September, Miss Bogan, on October 3, sought the aid of a friend whom she met at a Chicago tavern; after some conversation, he placed a telephone call, and she talked on the telephone with a man who gave his name as "Jimmy." She arranged to meet this man on the following day at a hamburger stand designated by him. She told him how she would be dressed, and the meeting took place as planned. The man identified himself as "Jimmy," and at the trial she identified him as the defendant Kalpak. After Kalpak made a telephone call, they went to her automobile. Kalpak drove. En route he told her it would cost $300, and asked if she had the money. On being advised that she had only $200 he told her she must have the additional $100 the next time. He also told her that the "Doc" they were going to see was a colored man. They stopped in front of a two-story brick house at 3630 S. Giles Avenue. Upon leaving the car, he asked for and received the $200. After verifying the house number from a card in his wallet, they both proceeded to the front door where Kalpak rang the bell. They were admitted by a man to whom Kalpak stated they were there to see "Doc." They then went up a flight of stairs to the second floor, where Miss Bogan saw a man whom she later identified as the defendant Johnson. Kalpak told Johnson: "This is the girl," and they entered a front room which was furnished with a day-bed, or cot, two chairs, a dresser and a desk.

Johnson asked her "how far gone" she was, and she replied three months. He told her to remove her undergarments and he and Kalpak left the room. Johnson returned and told her to lie on the cot which she did; he then put a sheet over her head, and again briefly left the

room, returned and placed an extension light between the calves of her legs. In a few moments she suffered a tingling, burning feeling on the inner portion of her left leg; and she sustained a burn which left a scar on that part of her left leg, halfway between the ankle and knee. At the trial, she exhibited this mark to the jury. At the time, Johnson apologized for his inadvertence. After this she felt a cold metal object being inserted into her vagina, then a spreading sensation; then she experienced a sharp cutting in her female organs. Johnson then said he would pack her with cotton and she felt a pushing and then a contracting sensation as the metal object was withdrawn. When she had dressed, Johnson gave her a glass of milky substance, which she drank, and three pills, which he told her to take that night. He directed her to remove the cotton before retiring. As she and Kalpak were leaving, Johnson told Kalpak to bring her back on October 6, at the same time. After they returned to the hamburger stand, Kalpak told her to be sure to have the other $100 on October 6.

Miss Bogan met Kalpak on October 6, gave him $100 and they proceeded to 3630 S. Giles Avenue. When they arrived Johnson asked her if anything had happened; she said "No," and asked to use the bathroom. He directed her to a toilet down the hall where she saw a small porcelain pan, a long stick wrapped with tape and twine, and an instrument that "looked like two shoe horns." At the trial she identified these objects as People's exhibits 5, 6 and 7. On her return, Johnson gave her a treatment similar to that received on her first visit. He again covered her head with a sheet. On this occasion, however, she experienced more pain. Johnson told her not to go to a hospital if she got sick, and that if nothing happened in 2 or 3 days, she should call "Jimmy." Neither defendant, in her presence, referred to the other by any surname. On the return trip she asked Kalpak for his telephone number.

He refused this information, and, instead, took her number and agreed to call her the following Sunday night, which he failed to do. She did not see him again until after his arrest on October 21.

On October 10, Miss Bogan's water bag, which enclosed the fetus, broke, and next day she began to experience severe cramping pains and became feverish and nauseated. She called, but could not reach, her physician, Dr. Kuzera. She contacted another physician who directed that she be taken to a hospital where she was admitted to the emergency room. There Dr. Kuzera examined her at about 3:30 P.M. He found that she had a high fever; that her uterus was enlarged and that there was a purulent, odoriferous discharge from the vaginal passage, all indicative of endometritis. He prescribed antibiotics, ice packs and bed rest.

On October 12 these pains continued, and on October 13 she expelled the fetus and placental tissue which was preserved for examination by the hospital pathologist, Dr. T. B. Horrell. He found that the specimen consisted of an irregular mass of placental tissue and a fetus showing early maceration; and that the section of the specimen prepared for microscopic examination showed colonies of cocci and bacilli within the placental tissue and in some of the areas of necrosis appearing in the fetus. Dr. Kuzera interpreted these findings by stating that what was to have been a human being showed infection and disintegration. It was his opinion, based on an examination of Miss Bogan on October 14, that it was not necessary that she have an abortion in order to preserve her life.

A policewoman assigned to the State's Attorney's office, talked to Dolores Bogan at the hospital on October 14. On October 18, Miss Bogan came to the Criminal Court Building where she talked to Irvin Lang, an assistant State's Attorney, and the policewoman. She described the Negro known as "Doc" as a man 65 to 70 years of age,

medium brown to black, 6 feet or better in height, with large rough hands, and a noticeable protruding lower lip. The man known to her as "Jimmy" was described as a man about 25 years of age, weighing about 175 pounds, 5 feet 8 to 8½ inches in height, with dark complexion and hair, and apparently of Italian or Greek extraction. Following the interview, separate "John Doe" warrants were obtained for the arrest of the two men. Officers William Norris, George Fors, and the policewoman, all working out of the State's Attorney's office, were assigned to the case. That same afternoon, officers Norris and Fors looked at the outside of the building at 3630 S. Giles, checked the city directory, and found that Mr. and Mrs. Rose, Mr. and Mrs. Williams, and James E. Johnson, were listed as living at that address. A telephone was listed under the exchange and number of Atlantic 5-5116.

The following day, officers Norris, Fors, and the policewoman met at the police garage at Eleventh and State streets, from which the policewoman placed a telephone call to Atlantic 5-5116. A lady answered the telephone and the officer asked for "Doc." When a man answered, she asked if he would be in his office. He replied, "Yes," and she told him she would be right out. The three officers then drove to the vicinity of 3630 S. Giles where all alighted from the police car. Norris and the policewoman walked to·the front of the building, and Fors went to the rear. Norris·rang the doorbell and he and the policewoman were admitted by a woman who was informed by the lady officer that she was there to see the doctor. The woman called up the stairway and a voice from above said: "Send them up." They proceeded upstairs and there found the defendant Johnson who answered the description given them. They entered Johnson's room and the policewoman asked to use the bathroom. While she was absent, Johnson asked Norris if the woman was his wife or girl friend, and how far along she was. Norris answered evasively.

Johnson told Norris not to worry about a thing; that he would give her the same treatment he had given others; that he would give her some medicine to clean out her stomach and she could come back tomorrow and have the job done; that she might miscarry there, or it might take two or three days, but that she would "get rid of it somehow." He further stated that he had done thousands of jobs; that he took care of the show girls from Cicero; and that he had taken care of one Italian girl three times in the last two years. When the policewoman returned to the room Johnson asked her how far along she was. When she said nothing he told her to sit on the bed and he would find out. As he began to unbutton her blouse, she jumped up and ran behind Norris, stating that she was afraid, and didn't think she wanted anything done. Johnson told her not to worry; that he had done thousands of abortions and hadn't had any trouble; that he did it by opening the womb; and that his charge to them would be $75, paid in advance. At this point Norris produced his police badge and the warrant, and arrested Johnson, who then said: "I knew it. I knew it. You tricked me!" Norris asked him what part of the premises he rented or controlled. He replied that he used the room they were in and a closet just outside his door off the hall.

Officer Norris and the policewoman then took Johnson downstairs where they contacted officer Fors who was outside. Fors remained there and went up to Johnson's room. Johnson was taken to the State's Attorney's office, where Dolores Bogan identified him as the man called "Doc" who had treated her. Johnson denied that he knew, or had ever seen her, and that he had performed an abortion on her.

After leaving Johnson and the policewoman at the State's Attorney's office, Norris returned to 3630 S. Giles where he met officer Fors, who had been in and out of Johnson's room while Norris was absent, but had made no search. Norris and Fors then searched the room and the

closet in question. In the closet, they found a porcelain pan and several instruments described as a vaginal speculum, a stick about 12 inches long wrapped in tape and twine, a dilator, and a sponge forceps. In Johnson's room they found a pen-type flashlight and a roll of cotton. All of these objects were seized, and the objects found in the closet were later introduced in evidence as People's exhibits. The officers also took about 50 bottles of medicine from the room, which were not produced or identified at the trial. Dr. Kuzera testified at the trial concerning the various instruments and their uses.

On October 21 at about 2:30 P.M. officers Norris, Fors and the policewoman went to the Silver Dollar Tavern located at 1522 West Madison Street, where Fors, aided by the other officers, arrested Kalpak. This arrest will be described later in this opinion.

Following his arrest, Kalpak was taken to the State's Attorney's office. On the way he asked Fors what it was all about, and Fors told him that Dolores was in pretty bad shape. After they arrived at the offices, Kalpak called Fors to one side and asked him how Dolores was. Fors told him that she was in a hospital but would be all right. Kalpak then said: "That's swell. I'm glad to hear that." But when Dolores Bogan came and identified Kalpak as "Jimmy," he stated that he did not know her and denied having anything to do with her abortion. Something was said about the $300 she had given him, and he said that if that was what she wanted she could have it right away. He also stated: "That's what I get for trying to help a broad out of trouble."

While Kalpak was in custody, officers Fors and Norris had him empty his pockets, and they took charge of the contents, which consisted of $180 in currency, two checks and miscellaneous cards and papers. Among these items was a card later introduced in evidence as People's exhibit 11. It was a business card of the Davey Day Lug-

gage Shop, and on the reverse side was written: "3630 S. Giles. Johnson. Abortion. At. 5-5116." In admitting the card in evidence the court instructed the jury that it was not to be considered as any evidence against Johnson. The court likewise instructed the jury that the articles taken at Johnson's residence were not to be considered as evidence against Kalpak.

Dr. Eli Bernick, a physician specializing in obstetrics and gynecology, was the only witness for the defendants. He was an instructor at Loyola University Medical School, and was attending obstetrician and gynecologist at the Lewis Memorial, Illinois Masonic, and Edgewater Hospitals. In answer to a long hypothetical question based on most of the facts in evidence relative to the case of Dolores Bogan, he expressed an opinion that expulsion of the fetus by the hypothetical person on the date in question was due to "spontaneous abortion," which he explained as the termination of pregnancy before the date of viability, by force of nature, without the aid of medicine or instrumentation. He further testified that the endometritis could have been caused by the breaking of the water bag, which would allow bacilli an access into the uterus; that if the water bag had been punctured on October 4 or 6, the fluid would immediately have gushed out; and that if instrumentation had occurred the objective and subjective symptoms would have appeared within the first six hours thereafter.

Defendants' first contention that the evidence does not prove them guilty of the crime charged is based upon the testimony of Dr. Bernick. They argue that the evidence, at most, shows an attempt to procure an abortion which will not justify a conviction of the crime of abortion; and that they are separate and distinct offenses. We agree that the offenses are separate and distinct, and that evidence showing that the defendant in fact procured an abortion will not sustain a conviction on the charge of attempted abortion. *People* v. *Stanko,* 407 Ill. 624.

The question remains, however, whether the jury was warranted in believing that the abortion in question was caused by the acts of the defendants as charged in the indictments. Aside from the testimony of Dr. Bernick, it would appear that the jury was justified in its conclusion. It is for the jury to determine whether the acts of the defendant caused or tended to cause the abortion, and it is not incumbent on the People to produce expert testimony to establish that fact, especially where there is no evidence that the abortion was caused by anything other than the acts of the defendant which were performed to effect that result. *People* v. *Khamis,* 411 Ill. 46.

Defendants' theory is that the abortion was spontaneous and they argue that the testimony of Dr. Bernick conclusively establishes that contention. The doctor testified as to the possible causes of spontaneous abortion. These included maternal factors such as an underactive or overactive thyroid, deficiency in ovarian hormones, malformation or tumor of the uterus, pleurisy, diabetes and syphillis. He also stated that spontaneous abortion could be caused by a defect in the fetus itself. Assuming that any of these causes might produce a spontaneous abortion, there is no evidence whatever that any such factors were present, nor did the doctor testify that any such factors, if present, would account for the acute infection of the uterus, which Dr. Kuzera found when he examined Dolores Bogan upon her admission to the hospital. This condition was observed by Dr. Kuzera only. Dr. Bernick could account for these objective symptoms only by saying that if the water bag broke on the 10th of October, that of itself would permit cocci and bacilli to enter the uterus and cause the condition. Dr. Kuzera differed sharply with Dr. Bernick on this point; he positively stated that the acute infectious condition he found on October 11 could not have been caused by the breaking of the water bag on October 10; and that the lapse of one day was too short a time to produce such a

result. If Dr. Bernick's theory of spontaneous abortion was to be accepted by the jury, he had to account for the acute endometritis. His explanation as to its possible cause was apparently rejected by the jury, and Dr. Kuzera's opinion was accepted. We cannot say that the action of the jury was not justified. We conclude that the jury was warranted in believing that the acts of the defendants caused the infection and the ultimate miscarriage. The case presents a situation where the jury was confronted with the divergent opinions of two reputable physicians. The question is not whether this court would have reached the same conclusion, but whether there was sufficient evidence to afford a basis for the jury's findings; and we believe there was.

The trial court's evidentiary rulings, to which defendants assign error, arose in the following manner. On re-direct examination, Dr. Kuzera was asked about a conversation with Dolores Bogan at the time of her admission to the hospital, and out of the presence of the defendants. Over objection, he testified that she told him that she previously had instrumentation and medication by a third party; and he further testified that this instrumentation would cause the breaking of the water bag. The court erred in admitting this testimony. However, on cross-examination one of defendants' counsel asked the doctor whether Miss Bogan told him that she had passed the fluid from her water bag the night before. He replied in the affirmative. He was then asked a line of questions designed to establish the defendants' theory that the subsequent infection came about as the result of the breaking of the water bag, which would permit bacilli access from the vagina into the uterus. The admission of this evidence would likewise have been improper if offered by the People on direct examination; however, it was not error to admit it on cross-examination since the People had utilized that part of the conversation which was favorable to develop their theory of the case.

The People induced the court to admit incompetent evidence and could not complain that the defendants availed themselves of similar evidence within the field of inquiry. (1 Wigmore, Evidence, sec. 15; McCormick on Evidence, sec. 57; 31 C.J.S., Evidence, sec. 190a; *Jones* v. *Sanitary District,* 265 Ill. 98.) Nor was it error to permit the doctor to testify in rebuttal that instrumentation might have caused the breaking of the water bag, since on cross-examination he had been asked whether the breaking of the water bag might have caused the infection, and both theories had been developed from information obtained from parts of the same conversation. If a witness testifies to part of a conversation on behalf of one party, the other is entitled to show all that was said in that conversation on the same subject. (*Scott* v. *People,* 141 Ill. 195.) If it was competent for the defendants to develop their defense from a statement made by Dolores Bogan to her physician, it was likewise competent for the People to utilize information given by her in the same conversation on the same subject tending to rebut the defendants' case. In view of the curative admissibility of the evidence elicited by the defendants on cross-examination, we find no reversible error in the trial court's evidentiary ruling to which error is assigned.

Defendants assign as error the court's refusal to give an instruction to the effect that if the jury believed from the evidence that the defendants attempted to procure an abortion and did not actually cause the expulsion of the fetus they should be found not guilty. They argue that the evidence showed only an attempted abortion, and that they were entitled to have the jury instructed on that theory. We agree that a defendant is entitled to the benefit of any defense shown by the entire evidence and has the right to have the jury instructed as to the law applicable to any state of facts which the jury might legitimately find to have been proved from the evidence. (*People* v. *Khamis,* 411 Ill. 46; *People* v. *Scalisi,* 324 Ill. 131.)

This court does not weigh the evidence upon a question of whether an instruction is proper on a certain theory, and very slight evidence upon a given theory of the case will justify the giving of an instruction. (*People* v. *Khamis,* 411 Ill. 46; *People* v. *Papas,* 381 Ill. 90.) However, twelve instructions were given at the request of the defendants. By one the jury was told that before it could convict either of the defendants the State must prove beyond a reasonable doubt that an instrument was used on the woman; that she was pregnant with child; that the use of the instrument caused a miscarriage; that the same was not done as necessary for the preservation of the mother's life; and that if the State failed to prove any one of these elements beyond a reasonable doubt it was their duty to acquit. The jury was also instructed that if it believed that the complaining witness had a spontaneous abortion, or if it was unable to determine whether the expulsion of the fetus was caused by the defendants, it must give them the benefit of the doubt, and find the defendants not guilty. The defendants' given instructions fully instructed the jury on the law applicable to any state of facts which it might legitimately find proved by the evidence, including the defense of spontaneous abortion. The refused instruction merely states the theory in different language and it was not error to refuse it.

The contention that the trial court erred in refusing to suppress evidence taken from the defendant James Kalpak at the time of his arrest is based upon the argument that the arrest was unlawful and that the search of his person and seizure of the property incident thereto were therefore likewise in violation of his constitutional rights. It is claimed that the "John Doe" warrant on which he was taken into custody did not comply with the requirements of section 4 of division VII of the Criminal Code, (Ill. Rev. Stat. 1953, chap. 38, par. 665,) in that it did not contain a description of the person to be arrested. De-

fendants confess that they are without Illinois authority on this question, and rely upon *Commonwealth* v. *Crotty,* 92 Mass. 403. However, since we are of the opinion that the officers in this case had lawful right to arrest Kalpak without a warrant, it will be unnecessary to consider this point. A peace officer has the right to make an arrest, without a warrant, for a crime not committed in his presence, when a criminal offense has in fact been committed and he has reasonable grounds for believing that the person to be arrested has committed it. (Ill. Rev. Stat. 1953, chap. 38, par. 657; *People* v. *Doody,* 343 Ill. 194.) To justify an arrest by an officer without a warrant, his ground for belief that the person arrested is guilty of the offense must be such as would influence the conduct of a prudent and cautious man under the circumstances. (*People* v. *Galloway,* 7 Ill.2d 527; *People* v. *Humphreys,* 353 Ill. 340; *People* v. *McGurn,* 341 Ill. 632.) Where the arrest is justified, the accompanying search without a search warrant is also justified, and evidence taken from the person as a result of that search is ordinarily admissible against him. (*People* v. *Clark,* 9 Ill.2d 400; *People* v. *Roberta,* 352 Ill. 189.) Conversely, if the arrest is unlawful, the property taken from the person as the result of a search incident thereto is not admissible in evidence, on motion to suppress it. *People* v. *Galloway,* 7 Ill.2d 527; *People* v. *Ford,* 356 Ill. 572.

The evidence in this case clearly shows that an offense had been committed and that the arresting officers had full knowledge concerning it. Formal complaint had been signed by the complaining witness who told the authorities that one of the persons to be arrested went by the name of "Jimmy" and she had given a reasonably accurate description of him. The officers also knew that he frequented the Silver Dollar Tavern.

On the afternoon of October 21, officers Norris, Fors and the policewoman went to this tavern. Officer Fors re-

mained outside, while the other officers went to a tavern across the street, where Norris placed a telephone call to the Silver Dollar and asked for "Jimmy." When a man answered, Norris asked him if he was "Jimmy," and the reply was, "Yes. How did you get my name?" Norris replied that someone out south gave it to him. The man on the line then said: "Well, what do you want?" Norris said: "I want to talk to you on a personal matter." The man then said: "Well, go ahead. What is it?" Norris replied that it was something personal and the man then said: "What's the matter, you got your broad knocked up? How far is she gone?" Meanwhile the policewoman had signalled across the street to officer Fors, who entered the Silver Dollar and went to the telephone booth where he opened the door and found a man talking on the telephone. Fors asked the man if he was "Jimmy" and he replied, "Yes," and asked Fors what it was all about. Fors stated that he was a police officer and had a warrant for his arrest. Norris, who was still on the line, heard this conversation. It appears that "Jimmy" answered the description of the man for whom they were looking. Fors identified the defendant Kalpak in open court as the man he had arrested in the telephone booth. The three officers took Kalpak to the Criminal Court Building where he was identified by Dolores Bogan. Thereafter the search was made which produced the card which was admitted in evidence as People's exhibit 11. We conclude that the arresting officers knew a criminal offense had been committed and had reasonable grounds to believe that the person arrested had committed the offense; that the arrest was lawful and the search incident thereto, also lawful. The card taken from Kalpak's person was relevant and material, and the trial court properly denied the petition to suppress it.

A different question is presented, however, when consideration is given to the seizure of the articles from defendant Johnson's home after he had been arrested and

removed to a place of confinement. The search and seizure were made without a search warrant and without his consent. Johnson was arrested by officer Norris and the policewoman, and they then made no search of the premises. Fors who had been outside the house was then admitted and waited in or near Johnson's room while the other officers took the defendant to a police station and thence to the State's Attorney's office. One hour and fifteen minutes elapsed. When Norris returned, they made the search and seized the articles from the room and closet. This search of Johnson's home, in his absence, without a search warrant, and without his consent, was clearly illegal and in violation of his rights, guaranteed by the fourth amendment to the constitution of the United States and section 6 of article II of the constitution of Illinois. (*Johnson* v. *United States,* 333 U.S. 10; *Agnello* v. *United States,* 269 U.S. 20; *People* v. *Grod,* 385 Ill. 584.) The admission in evidence, over objection, of the articles thus seized, violated said defendant's rights guaranteed by the fifth amendment to the United States constitution and section 10 of article II of the Illinois constitution. (*People* v. *Grod,* 385 Ill. 584, 592.) Johnson's motion to suppress should have been allowed. Review of the authorities on this question is unnecessary. This court recently reconsidered the entire subject in the light of *Wolf* v. *Colorado,* 338 U.S. 25, 93 L. ed. 1782, and announced its continuing adherence to the exclusion rule. (*City of Chicago* v. *Lord,* 7 Ill.2d 379.) A defendant, whether guilty or innocent, is entitled to a fair, orderly and impartial trial in accordance with our laws. Under our system of jurisprudence, there is not one form of trial for a guilty person, and a different form for an innocent person. (*People* v. *Galloway,* 7 Ill.2d 527; *People* v. *Stanko,* 407 Ill. 624.) Therefore, although there was other evidence tending to establish Johnson's guilt, we are compelled to reverse the judgment of the criminal court as to him and remand the cause for a new trial.

The reversal as to the defendant Johnson will not require a reversal as to defendant Kalpak. Under our law an accessory before the fact is considered a principal and may be punished accordingly. He may be indicted and convicted at the same time as the principal, or before or after his conviction, and whether or not the principal is convicted or amenable to justice. (Ill. Rev. Stat. 1953, chap. 38, pars. 582, 583.) In the instant case, the articles taken from Johnson's room were admitted in evidence only against Johnson and the jury was so instructed. It was further instructed that these items should not be considered as any evidence against the defendant Kalpak, or as tending to establish his guilt. Though Kalpak made a motion for a separate trial, which was denied by the trial court, he has not urged in this court that the denial of his motion was erroneous. No motion to suppress the evidence taken from Johnson's home was made by Kalpak. It is the rule in this and other jurisdictions that where no timely motion to suppress the evidence is made, evidence obtained by an unlawful search and seizure is admissible. (*People* v. *Valecek,* 404 Ill. 461; Anno. 50 A.L.R.2d 531, 583.) It appears to us that James Kalpak had a fair trial, free from substantial prejudicial error, and that as to him the judgment should be affirmed.

The judgment of the criminal court of Cook County as to the defendant James Kalpak is affirmed. The judgment of the criminal court of Cook County as to the defendant James E. Johnson is reversed and the cause remanded for a new trial.

*Affirmed as to Kalpak; reversed*
*and remanded as to Johnson.*