THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellant, *v.* CURTIS BROWN *et al.*, Defendants-Appellees.

Fourth District    No. 15901

Opinion filed September 5, 1980.—Rehearing denied October 15, 1980.

J. William Roberts, State's Attorney, of Springfield (Gary J. Anderson and Darryl D. Pratscher, both of State's Attorneys Appellate Service Commission, of counsel), for the People.

Richard J. Wilson and Jeffrey D. Foust, both of State Appellate Defender's Office, of Springfield, for appellees.

Mr. PRESIDING JUSTICE MILLS delivered the opinion of the court:

Armed robbery.

The stop, arrest, search, evidence, confessions—all suppressed.
We reverse.

For we have here a classic example of collective and cooperative police work!

## Facts

The following evidence was presented at the hearing on the suppression motions. State Police Officer Thomas Yokley testified that on July 7, 1979, he received a radio message from the Springfield police department. The message said that there had been an armed robbery at the Boar's Head Restaurant in Springfield, that the suspects were three black males with a sawed-off shotgun, that the possible vehicle was an older brown Cadillac, and that the possible route of travel would be east on Interstate 72.

While proceeding east on Interstate 72, Officer Yokley overtook a late model brown Cadillac. The officer noted two black males inside. The Cadillac's driver was not violating any traffic laws. According to the officer, a car leaving the Boar's Head 15 minutes earlier would have been in this general area.

The officer pulled the Cadillac over to the side of the road. On cross-examination, Yokley testified that he did not have the intent to arrest any of the occupants when he initially stopped the vehicle, but was merely checking the car based on the radio dispatch. He did not know definitely whether a car had been involved in the robbery. He stated that at this point he did not have reason to arrest them.

As the officer left his vehicle, he saw a head in the rear seat of the car bob up and down. There were actually three black males in the car. Officer Yokley then drew his weapon and ordered the occupants to lie down on the shoulder of the road. Officer Yokley admitted that the defendants were probably under arrest at this time, because they could not go anywhere. During final argument, the State conceded that the court would consider the defendants to be under arrest at this point.

Officer Yokley stated that he ordered the defendants out of the car because he feared for his safety. He then searched the defendants' car and discovered a typewriter case, a sawed-off shotgun, small and large envelopes, and a blue money bag containing United States currency. The defendants were told that they were under arrest, advised of their rights, and transported to the Springfield police department.

At the station, each defendant admitted his participation in the armed robbery and defendant Brown said that he owned the vehicle involved.

Much of the hearing focused on the origins of the Springfield police department radio message. Springfield Officer Huber testified that he told the dispatcher to relay the message. In formulating the message, he relied upon three sources of information: (1) the original report that there had been a robbery at the Boar's Head, (2) information received that

evening from Officer Daley, and (3) information received two weeks earlier from Officer Palazzolo.

Officer Daley had told Officer Huber that a brown or brownish-green Cadillac might have been involved in the Boar's Head robbery. Officer Daley admitted that he had no personal knowledge that any vehicle was even used at the Boar's Head.

All information that Officer Daley relayed to Officer Huber was based on data that he had received from Sergeant Palazzolo about a week before. Officer Daley testified that Palazzolo told him of some other armed robberies. These robberies had involved a brown Cadillac and black male suspects.

Officer Huber had also received some general information from Officer Palazzolo, about 10 to 14 days before the Boar's Head robbery. Palazzolo told Huber that there had been a meeting in reference to some armed robberies in different central Illinois cities. Officer Palazzolo never "exactly" informed Officer Huber of the race of the other armed robberies' suspects. Palazzolo told Huber that different vehicles had been used in the robberies, but a brown Cadillac stuck out in Officer Huber's mind.

Officer Palazzolo testified about the meeting held with officers from several central Illinois communities to discuss a series of armed robberies in the area. Based on the meeting, and a conversation with a Peoria detective, he told Daley that the armed robberies might involve a late model, possibly brown, Cadillac. However, at the meeting they also discussed several other vehicles. He stated that the general conception was that the suspects were black males. He also told the radio dispatcher that a large brown Cadillac, GM, Buick, or Oldsmobile might be a suspected car in any future armed robberies. Officer Palazzolo said that a brown Cadillac had been seen twice, once in East Peoria at a Pizza Hut robbery and once in either Lincoln or Bloomington. However, on cross-examination, he was shown a police report from East Peoria which said that the suspects' vehicle in the Pizza Hut robbery was a brown Buick.

Officer Michael Cook, a criminal investigator for the city of Champaign, gave extensive testimony concerning the meeting attended by Officer Palazzolo. The purpose of the meeting was to develop a profile for the modus operandi of recent armed robberies of fast-food restaurants in the general area. On direct examination, Officer Cook said that the robberies usually occurred from 2 a.m. to 3 a.m. On cross-examination, he testified that the police reports indicated times from approximately 1 a.m. to 5 a.m. He said that the average number of perpetrators was usually three although the number did go as high as five. On cross-examination, the officer read from police reports which showed that there was a different number of perpetrators each time, ranging from one to six. Officer Cook said that revolvers and a sawed-off shotgun were believed to be the

robbery weapons. Later, Cook said that there was no mention of the use of a shotgun in the reported robberies. Officer Cook said that a Peoria detective had put out a computer message requesting various agencies to be on the lookout for robberies in which a brown Cadillac was involved. At the meeting, the vehicles mentioned most often were a brown Cadillac, Oldsmobile, or Buick, or a dark or black Cadillac, in that order. However, none of the vehicles mentioned above were positively identified as having been involved in any of the armed robberies. On cross-examination, Officer Cook admitted that his report contained a list of at least 22 different suspect vehicles. The agencies had no concrete facts indicating any particular subjects. Officer Cook compiled a report based upon the information received at the meeting. A brown Cadillac was mentioned in his report because one of the probable suspects, favored by some of the agencies, drove a Cadillac.

Officer Cook said that, based on the information given at the meeting, he would expect an armed robber to choose Interstate 72 as a likely escape route from an armed robbery occurring in Springfield.

### Issues

On appeal, the State claims: (1) that defendants Huff and Amos lacked standing to challenge the lawfulness of the search of the suspect vehicle, and (2) that the trial court erred in granting the defendants' motion to suppress.

### I. *Standing*

Relying on *Rakas v. Illinois* (1978), 439 U.S. 128, 58 L. Ed. 2d 387, 99 S. Ct. 421, the State claims that defendants Huff and Amos lack standing to assert a violation of their fourth amendment rights since they were riding in a car which was owned by defendant Brown.

■■ However, the State failed to raise this issue in the trial court at the suppression hearing. Therefore, we find waiver and need not address the merits of the question. *People v. McAdrian* (1972), 52 Ill. 2d 250, 287 N.E.2d 688; *People v. Edwards* (1974), 21 Ill. App. 3d 354, 315 N.E.2d 91 (abstract).

### II. *Suppression*

The State also contends that the three defendants' separate motions to suppress were improperly granted because sufficient justification existed for: (a) the initial stop of defendant's vehicle by the police, (b) the defendants' arrest, and (c) the subsequent search of the defendant's vehicle. As a corollary to this claim, the State asserts that the defendants' confessions were admissible because they were not the fruit of an illegal search and seizure. We agree.

The standard for the appellate review of a motion to suppress is whether the finding of the trial court was manifestly erroneous. *People v. Williams* (1974), 57 Ill. 2d 239, 311 N.E.2d 681, *cert. denied* (1974), 419 U.S. 1026, 42 L. Ed. 2d 302, 95 S. Ct. 506.

## A. *Stop*

An investigatory stop must be justified with specific facts which, taken together with rational inferences from those facts, reasonably warrant the intrusion. (*Terry v. Ohio* (1968), 392 U.S. 1, 20 L. Ed. 2d 889, 88 S. Ct. 1868.) An examination of the stop in this case must focus on both the radio bulletin and circumstances at the time of the stop.

■■ When making the stop here, Officer Yokley relied most heavily on the radio message. Police officers are entitled to act upon information received in official police communications. (*People v. Harris* (1980), 83 Ill. App. 3d 1123, 404 N.E.2d 1020.) However, this reliance raises the question of whether the law enforcement system as a whole has complied with fourth amendment requirements. In terms of probable cause for an arrest, this means that evidence should be excluded if the officer or agency which issued the request for action did not possess facts adding up to the probable cause. (LaFave, Search and Seizure §3.5(b), at 624 (1978); see *Whiteley v. Warden* (1971), 401 U.S. 560, 28 L. Ed. 2d 306, 91 S. Ct. 1031.) Cases following *Whiteley* have differed as to whether it must be shown that an individual at the source agency brought together a sufficient collection of underlying facts to add up to probable cause or whether a showing that the requesting agency possessed enough facts would suffice. We adopt the position that, when dealing with the lesser standard for investigatory stops, it is sufficient if the requesting agency possessed facts which would warrant the stop. We find that, in the instant case, the Springfield police department possessed sufficient facts to make the radio message a reliable basis for the stop by the State police.

The stop's validity is further enhanced when the immediate circumstances surrounding the stop are combined with the information in the radio message. In Search and Seizure, LaFave describes fact combinations which would tend to give rise to grounds for stopping suspects soon after an offense is committed:

> "No litmus paper test is available to resolve this issue, but yet it is possible to identify several factors which are appropriately taken into account in making this judgment. Generally, it may be said that consideration may properly be given to: (1) the particularity of the description of the offender or the vehicle in which he fled; (2) the size of the area in which the offender might be found, as indicated by such facts as the elapsed time since the crime occurred; (3) the number of persons about in that area; (4) the

known or probable direction of the offender's flight; (5) observed activity by the particular person stopped; and (6) knowledge or suspicion that the person or vehicle stopped has been involved in other criminality of the type presently under investigation." 3 LaFave, Search and Seizure §9.3 at 84 (1978).

■■ Here, as a result of an exchange of information among law enforcement agencies, Officer Yokley knew that the suspects might be fleeing in an easterly direction on an interstate highway and I-72 was the only such interstate in the area. Yokley knew the suspects were black males. He saw two black males in the vehicle. The defendants' rate of travel—combined with the time elapsed between the robbery and the stop—put the defendants an appropriate distance away from the scene of the robbery. The radio message suggested the suspects were driving an older brown Cadillac and the defendants were driving a late model brownish-green Cadillac. LaFave also points out that police are justified in making a stop at an early morning hour with a much less comprehensive description of suspects than would be adequate if the stop were made at midday. Here, the stop was made around 3 a.m. Thus, the time of the stop also supports the police. In conclusion, we find that the radio message was based upon specific facts. This message, combined with Yokley's own observations, constituted sufficient facts and rational inferences therefrom to justify the stop.

## B. *Arrest*

■■ Next, we consider whether there was probable cause for the defendants' arrest. A person may be arrested without a warrant when probable cause exists for the arrest. This occurs when the facts and circumstances within the arresting officer's knowledge are sufficient to warrant a man of reasonable caution to believe that an offense has been committed and that the person arrested has committed this offense. The police need not have evidence against the defendant sufficient to sustain a conviction. *People v. Robinson* (1976), 62 Ill. 2d 273, 342 N.E.2d 356.

■■ We note that whether or not probable cause for an arrest exists in a particular case depends upon a totality of the facts and circumstances known to the officers at the time of the arrest. Again, the standard of review is whether the trial court's determination is manifestly erroneous. (*People v. Clay* (1973), 55 Ill. 2d 501, 304 N.E.2d 280.) If an arrest is unlawful, the property taken from the person as a result of the search incident thereto is subject to suppression given a proper motion. *People v. Kalpak* (1957), 10 Ill. 2d 411, 140 N.E.2d 726.

■■ Under the facts and circumstances presented at the suppression hearing, the trial court's determination that probable cause was absent was manifestly erroneous. When Officer Yokley came up to the stopped car,

he saw the head of a third individual bob up and down. This observation provided the final verification of the radio message which had led him to stop the Cadillac. The defendants had a vehicle similar to that mentioned in the dispatch, a dark Cadillac. They were traveling in the direction mentioned in the dispatch on the probable escape route. Finally, they fit into the general physical description of "three black males." Thus, the radio message, combined with the officer's personal observations, provided probable cause for an arrest.

### C. *Search*

■■ The radio dispatch also warned that the suspects may have been armed with a sawed-off shotgun. Officer Yokley said that he searched the vehicle for safety and weapons. We find that the search was reasonable under the fourth amendment because probable cause was present.

> "For constitutional purposes, we see no difference between on the one hand seizing and holding a car before presenting the probable cause issue to a magistrate and on the other hand carrying out an immediate search without a warrant. Given probable cause to search, either course is reasonable under the Fourth Amendment." (*Chambers v. Maroney* (1970), 399 U.S. 42, 52, 26 L. Ed. 2d 419, 428, 90 S. Ct. 1975, 1981.)

Here, the automobile was stopped at night on a major highway. The car was similar to those which had been used in previous crimes of the same type. There was an indication that the automobile might contain weapons and other evidence of the crime. The automobile was mobile. Under *Chambers*, the search was clearly reasonable.

Since we have found the investigatory stop, the arrests, and the search to be proper, the defendants' confessions are not tainted. Thus, they should not have been suppressed as the illegal fruits of an unlawful arrest.

Reversed.

LEWIS and GREEN, JJ., concur.