**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2023 IL App (3d) 220044-U

Order filed March 21, 2023

_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2023

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of the 13th Judicial Circuit, Bureau County, Illinois, |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | Appeal No. 3-22-0044 Circuit No. 21-CF-49 |
| | ) | |
| QUINCY L. MCCOY, | ) ) | Honorable James A. Andreoni, |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

JUSTICE DAVENPORT delivered the judgment of the court.
Justices McDade and Peterson concurred in the judgment.

_____

**ORDER**

¶ 1      *Held*: (1) Police had reasonable articulable suspicion to justify a *Terry* stop when they heard gunshots coming from two blocks away in the early morning hours in an area that was otherwise quiet; they saw defendant activate his headlights and drive away at the time the gunshots were heard; and there were no other vehicles or people observed leaving the immediate area. (2) The State's failure to disclose a silent video that portrayed police attempting to read defendant the *Miranda* warnings before terminating the interview for defendant's refusal to initial the *Miranda* form did not amount to a *Brady* violation. Affirmed.

¶ 2      A jury convicted defendant of unlawful possession of a firearm by a felon (720 ILCS 5/24-1.1(a) (West 2020)) and the trial court sentenced him to nine years' imprisonment. On appeal,

defendant raises two arguments: first, that the trial court erred in refusing to suppress the gun recovered during a traffic stop; and second, that the State's failure to preserve the video of defendant's interaction with police at the police station violated *Brady v. Maryland*, 373 U.S. 83 (1963). We affirm.

## I. BACKGROUND

### A. The Stop

At approximately 3:37 a.m. on August 31, 2021, Spring Valley police officers Alex Erschen and Zane Behrens heard what they believed to be gunshots while on patrol. Officer Erschen was within two blocks of the shots but was not close enough to see them. Officer Behrens, who was a block away, observed a parked vehicle activate its headlights at the same time he heard the shots. Both officers proceeded to the area where the gunshots came from, within 15 to 20 seconds of the shots, they saw defendant driving in a silver SUV, and the officers stopped the SUV.

Officer Erschen approached the vehicle and saw defendant, the sole occupant, reaching into the backseat. As he was speaking to defendant, he observed a black gun case on the back floorboard that was propped up against the back of the center console. He asked defendant if there was a gun inside, to which defendant stated there was. Officer Erschen retrieved and secured the gun, a Taurus G3C. It had a 12-round magazine, and there were 4 rounds in it. Defendant told Officer Erschen that the gun belonged to his girlfriend and he did not have a firearm owner's identification (FOID) card.

As defendant stepped out of the vehicle, he told the officers that he had another gun in his waistband. He gave a Ruger LCP 380 pistol, which was loaded with seven rounds, to Officer Behrens. Defendant told officers that this gun also belonged to his girlfriend.

¶ 8    During the stop, the officers received information from dispatch about a 911 call reporting the sound of gunshots. The caller indicated she heard gunshots at approximately 3:42 a.m., and she saw a gray SUV stopped at the location. The caller did not give a description of the driver.

¶ 9    Officer Behrens's squad-car video, which we have reviewed, showed that no other vehicles were driving in the area until after he initiated the stop of defendant's vehicle. One vehicle is seen coming from the east at 45 seconds, and one vehicle is seen coming from the west at 55 seconds. But neither was observed by police to be in the vicinity of the gunshots at the time shots were fired.

¶ 10    The officers ultimately learned that defendant was a felon and not allowed to possess a firearm. They placed defendant under arrest and brought him to the station.

¶ 11                                B. At the Station

¶ 12    At approximately 4:25 a.m., Officer Erschen brought defendant into the interrogation room and read defendant his *Miranda* warnings. Defendant signed the *Miranda* waiver but refused to initial it. Because defendant refused to initial the form, Officer Erschen terminated the interview.

¶ 13    Officer Erschen later explained that the interrogation room has audio and video recording capabilities, but audio is not automatically recorded. To record any audio, one must turn on the equipment, which is locked in the chief's office. The video in the interrogation room is a live feed to dispatch. But if the audio function is not turned on, the video will not save. The live feed exists for 14 days until it is written over, as it is a continuous recording. Only three individuals, none of whom were present, had access to the chief's office. There never was any audio recording of Officer Erschen reading the *Miranda* warnings, and, thus, the video recording was not saved.

¶ 14                                C. The Charges

¶ 15    A grand jury indicted defendant on two counts of unlawful use of weapon by a felon, alleging that, on August 31, 2021, defendant possessed a Ruger LCP 380 pistol after having been

3

convicted of residential burglary (count I) and unlawful use of weapon by a felon (count II). The grand jury also indicted defendant on one count of reckless discharge of a firearm (count III).

## D. Motion to Suppress

¶ 16 Defendant moved to suppress all evidence gathered during and after the stop, contending the police seized him without reasonable suspicion or probable cause, in violation of his fourth amendment rights (U.S. Const., amend. IV). At the hearing, Officers Erschen and Behrens testified consistently with the facts set forth above. The officers also testified that they stopped defendant based on the sound of the gunshots and the fact that defendant's vehicle was the only one they saw in the area.

¶ 17 The trial court denied the motion, finding that the evidence overwhelmingly established the officers had reasonable suspicion, under *Terry v. Ohio*, 392 U.S. 1 (1968), to stop defendant. The court stated,

"Now, in this case, it's 3:37 in the morning on a Tuesday morning. The officers hear what they believe to be gunshots. And for the purpose of a reasonable articulable suspicion, they don't have to even be right that they're gunshots, but they testified that they hear what were gunshots. There's only one vehicle in the area where they heard the gunshots, and the officer stopped that vehicle to investigate. All of that is perfectly permissible, in the court's opinion, under *Terry*. And after they stopped the vehicle, they saw the gun box. They certainly had a right to investigate further as to what would have been in the gun box."

¶ 18 ## E. Trial

¶ 19 The State dismissed counts I and III and proceeded only on count II. Defendant asserted a necessity defense.

4

¶ 20    Officer Behrens testified that at 3:37 a.m., he was parked facing west. He noticed in his driver's side mirror a vehicle facing west approximately one block away activate the headlights. He then heard a sound that he knew to be a gunshot. It sounded like the gunshots came from the area where the vehicle had activated its headlights. The vehicle then turned around, and Officer Behrens attempted to locate it. He found the same vehicle, which he described as a light-colored SUV, and initiated an investigatory stop. From the time he heard the gunshots and started looking for the SUV, he did not see any other vehicles driving on the streets.

¶ 21    Officer Erschen testified that he heard three gunshots, proceeded to the area where he heard them, and saw Officer Behrens had stopped defendant's vehicle. He did not see any other vehicles on the roadway. As he approached the vehicle, he saw defendant reaching into the back seat. During the stop, dispatch advised that a caller reported hearing gunshots right outside her house and observed a gray SUV speeding off.

¶ 22    Defendant testified that he was staying with a friend in Spring Valley due to a disagreement with his girlfriend.[1] He and his girlfriend have separate cars, and when he visited her in Woodridge on August 29, she borrowed his SUV. She had a FOID card, and she kept her weapons in her car. He returned to Spring Valley on August 30. After midnight on August 31, he went to some parties. He testified he was robbed at knifepoint by an unknown individual. Immediately after, his friend's cousin, "Sway," who was with defendant that evening, went to defendant's SUV and pulled out the Taurus from the back seat. Defendant testified that he did not know the gun was in his SUV. Sway saw the gun while riding in defendant's SUV the previous day. Defendant managed to

---

[1] During trial, he described her as his fiancée, but in the prior proceedings, she was described as his girlfriend.

5

wrestle the gun away, jumped in his SUV, and left. No gunshots were fired. He wanted to call the police to report the robbery, but he did not know the names of the streets, so he drove around.

¶ 23    As defendant drove around, the police stopped him. He put the Taurus in the gun box. He then noticed the Ruger, which he did not even know was still owned by his girlfriend, and placed it in his fanny pack. Defendant did not know why he was stopped. He was initially relieved until the officers told him that he had been pulled over for shots fired. He knew nothing of the shots fired. The officers asked about the black box in the back seat, and he told them it was his girlfriend's weapon. As he was stepping out of the vehicle, he told the officers about the Ruger.

¶ 24    Defendant testified he never had a chance to tell the officers about being robbed at the scene. At about 4 a.m., he told the officers that he was robbed, but this was not on video. Defendant could not recall who he told.

¶ 25    Defendant testified that, after his arrest, his girlfriend informed him that she had placed her guns in his SUV when she borrowed it and did not remove them. She took the guns with her wherever she goes.

¶ 26    The State called Officer Erschen in rebuttal. He testified that on August 31, defendant never told him that he had been robbed at knifepoint or that he had a gun pulled on him. After being transported to the police department, defendant never mentioned being robbed. Officer Erschen heard defendant's version of events for the first time at trial.

¶ 27    The jury found defendant guilty.

¶ 28                                    F. Posttrial Proceedings

¶ 29    Defendant separately moved for a judgment notwithstanding the verdict, for a new trial, and to reconsider the denial of his motion to suppress. The court denied the motions and sentenced defendant to nine years' imprisonment. This appeal followed.

6

¶ 30                                    II. ANALYSIS

¶ 31                                  A. The *Terry* Stop

¶ 32        Defendant first contends the trial court erred when it denied his motion to suppress. Specifically, defendant argues the police lacked a reasonable articulable suspicion to stop him where the sole basis for the stop was that the police heard gunshots.

¶ 33        We review a circuit court's ruling on a motion to suppress using a two-part test. See *Ornelas v. United States*, 517 U.S. 600, 699 (1996). We will uphold the trial court's factual findings unless they are against the manifest weight of the evidence. *People v. Absher*, 242 Ill. 2d 77, 82 (2011). We then assess the established facts in relation to the issues presented and may draw our own conclusions as to what relief is warranted. *Id.* Thus, we review *de novo* the ultimate question of whether suppression was warranted. *Id.*

¶ 34        The Fourth Amendment provides the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated. *Terry v. Ohio*, 392 U.S. 1, 8 (1968). "Stopping an automobile and detaining its occupants constitute a 'seizure' within the meaning of the Fourth and Fourteenth Amendments to the United States Constitution. Accordingly, such a seizure is justified only if it meets the requirement of 'reasonableness.'" *People v. Garman*, 123 Ill. App. 3d 682, 684 (3d Dist. 1984). "A police officer may make a valid investigatory stop absent probable cause for an arrest when the officer's decision is based on specific, articulable facts which warrant the investigative stop intrusion. The police officer must have an 'articulable suspicion' that the person has committed or is about to commit a crime. Mere hunches and unparticularized suspicions are not enough." *People v. Moore*, 286 Ill. App. 3d 649, 653 (3d Dist. 1997). "Where a police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot, the officer

7

may briefly stop the suspicious person and make 'reasonable inquiries' aimed at confirming or dispelling his suspicions." *People v. Marchel*, 348 Ill. App. 3d 78, 80 (1st Dist. 2004). "A brief investigatory stop, even in the absence of probable cause, is reasonable and lawful under the fourth amendment when a totality of the circumstances reasonably lead the officer to conclude that criminal activity may be afoot and the subject is armed and dangerous." *People v. Colyar*, 2013 IL 111835, ¶ 32. "The facts should not be viewed with analytical hindsight, but instead should be considered from the perspective of a reasonable officer at the time that the situation confronted him or her." *People v. Thomas*, 198 Ill. 2d 103, 110 (2001).

¶ 35    Defendant relies on *In re D.L.*, 2017 IL App (1st) 171764, to support his argument that police had no reasonable suspicion of criminal activity when they stopped his vehicle based solely on the fact that he was in the area where gunshots were heard. In *D.L.*, police received a dispatch at 8:20 p.m. concerning multiple shots fired in an urban area. Dispatch provided no information of the identity of the suspects or callers. Police were approximately one minute away from the scene. One minute later, officers saw the defendant and another male walking quickly away from the area of the shots fired call. There were no other people on the street at the time. Police observed the respondent for five seconds before ordering him to stop, at which point the respondent fled. At the hearing on the motion to quash arrest and suppress evidence, the officer testified that he did not observe the respondent toss anything; he did not see any bulges in his clothing; and he only saw the respondent walking quickly for five seconds. The court held the police were not justified in temporarily detaining the defendant, and therefore the subsequent search was not justified, commenting that most people would be inclined to make a quick departure from the scene of gunfire, and such behavior would not be unusual. *D.L.*, 2017 IL App (1st) 171764 at ¶ 21.

8

¶ 36    The State relies on *People v. Mendez*, 371 Ill.App.3d 773 (2d Dist. 2007). In *Mendez*, a police officer in a suburb heard gunshots at 3 a.m., approximately 300 to 400 yards away. It was otherwise calm outside and there was no other noise or vehicular traffic. The officer immediately got into his squad car and proceeded toward the area. Five to six seconds after entering his vehicle and after traveling less than 100 yards, he met another vehicle at the intersection. The car was moving at a normal rate of speed, and the driver had an expression of shock on his face. The officer initiated an investigatory stop. As the officer approached the vehicle, he observed two spent shell casings on the car's exterior. The court noted,

> "There are several factors that tend to give rise to grounds for stopping a suspect soon after an offense is committed. *People v. Brown*, 88 Ill. App. 3d 514, 519 (4th Dist. 1980). No litmus paper test is available to resolve this issue, but yet it is possible to identify several factors which are appropriately taken into account in making this judgment. Generally, it may be said that consideration may properly be given to: (1) the particularity of the description of the offender or the vehicle in which he fled; (2) the size of the area in which the offender might be found, as indicated by such facts as the elapsed time since the crime occurred; (3) the number of persons about in that area; (4) the known or probable direction of the offender's flight; (5) observed activity by the particular person stopped; and (6) knowledge or suspicion that the person or vehicle stopped has been involved in other criminality of the type presently under investigation." *Mendez*, 371 Ill. App. 3d at 776.

The court ultimately determined the totality of the circumstances showed the police had a reasonable suspicion to justify the stop. *Mendez*, 371 Ill. App. 3d at 777-78.

¶ 37    We find this case to be more analogous to *Mendez* than *D.L.* The events in *D.L.* occurred in an urban area at approximately 8:30 p.m. and involved the defendant fleeing the area. In contrast, the events in *Mendez* occurred at 3:00 a.m., with no other vehicle traffic or noises.

¶ 38    In this case, the police officers heard gunshots in the same area where defendant's vehicle was located. At the same time, defendant activated his headlights and immediately drove away. Officers Erschen and Behrens were nearby and only 15 to 20 seconds had elapsed between hearing the shots and approaching defendant. Both officers testified that defendant's vehicle was the only one seen leaving the area; there were no other persons out at 3:37 a.m. According to Officer Erschen, Spring Valley is "pretty dead" at that time. The squad-car video shows no other vehicles were present until after defendant was already pulled over by police, and both were approaching the vicinity, not leaving from it. When defendant was stopped, he was observed reaching into the back seat, where police then observed a black gun box that defendant stated contained a gun. Under these circumstances, we conclude the officers had a reasonable suspicion to justify the stop.

¶ 39    In reaching this conclusion, we note "police are justified in making a stop at an early morning hour with a much less comprehensive description of suspects than would be adequate if the stop were made at midday." *Brown*, 88 Ill. App. 3d at 520. Given the time of day and the absence of any other persons in the vicinity, the fact the police did not have a description of the shooter is of no consequence.

¶ 40    Our courts have held that police officers may form a reasonable suspicion that individuals were involved in shootings when police observe those individuals in the area in which shots were fired. *People v. Rojas*, 359 Ill. App. 3d 392, 407 (1st Dist. 2005). In *People v. Basiak*, 50 Ill. App. 3d 155, 158 (1977), police heard a gunshot at 2 a.m., and the defendant and his companion were the only people in the area. The investigatory stop was proper because police were investigating

10

the gunshot and had reason to believe the individuals were armed and dangerous. *Id.* In *People v. Lee*, 48 Ill. 2d 272, 277 (1971), our supreme court held that police were justified in stopping the defendants for questioning when they heard gunshots and observed the defendants' group as the only persons in the area where gunshots were heard minutes later and two blocks away.

¶ 41    Accordingly, we hold that the police had reasonable suspicion to justify the stop, and, therefore, the trial court correctly denied defendant's motion to suppress.

¶ 42                    B. The Alleged *Brady* Violation

¶ 43    The standard of review for a court evaluating a discovery violation is abuse of discretion. *People v. Weaver*, 92 Ill. 2d 545, 559 (1982). "A reviewing court will find an abuse of discretion, however, when a defendant is prejudiced by the discovery violation and the trial court fails to eliminate that prejudice." *Id.*

¶ 44    "Suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady v. Maryland*, 373 U.S. 83, 87 (1963). "This rule encompasses evidence known to police investigators, but not to the prosecutor." *People v. Beaman*, 229 Ill. 2d 56, 73 (2008). The burden of establishing a *Brady* violation is on the defendant. *People v. Goldsmith*, 259 Ill. App. 3d 878, 888 (1st Dist. 1994). In *Beaman*, the court explained,

> "A *Brady* claim requires a showing that: (1) the undisclosed evidence is favorable to the accused because it is either exculpatory or impeaching; (2) the evidence was suppressed by the State either wilfully or inadvertently; and (3) the accused was prejudiced because the evidence is material to guilt or punishment. [Citation.] Evidence is material if there is a reasonable probability that the result of the proceeding would have been different had the evidence been disclosed. [Citation.] To establish materiality, an accused must show the

11

favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." (Internal quotation marks omitted.) *Beaman*, 229 Ill. 2d at 73-74.

¶ 45 Defendant argues the recorded length of silent video from the interrogation room in the police department could have been used by the defense to argue that defendant had additional conversations with police after his arrest, which would have corroborated his trial testimony that he told the officers about the robbery at the station and disproved the State's rebuttal testimony The State submits that this argument is without merit because nothing can be learned from defendant's refusal to sign the *Miranda* form, and there was no evidence contained on the video that would have supported his contention that he told the interviewing officer about the robbery.

¶ 46 It is undisputed that the video was silent and not preserved. What is in dispute is whether (1) the silent video was either exculpatory or impeaching; and (2) this evidence was material to guilt or punishment. We answer both in the negative.

¶ 47 Here, the unpreserved video was silent. As such, there is nothing to demonstrate the video was exculpatory or impeaching.

¶ 48 Nor was the silent video material to defendant's guilt or punishment. Even if the video was disclosed, it would not have put the case in a different light. Officer Erschen testified that the video would have shown him attempting to read defendant the *Miranda* rights, and the interaction was immediately terminated when defendant would not initial the form. Officer Erschen also testified that defendant did not actually tell him about the robbery at any point on August 31; in fact, he only heard about it for the first time at trial. And, even assuming the video showed Officer Erschen and defendant talking for a longer period, we would have to rely on speculation to conclude that defendant was telling Officer Erschen about the robbery. Further, defendant testified at trial about

12

the robbery and presented the defense of necessity, and the jury heard his version of events. Nothing about the silent video even reasonably suggests that the outcome of the case could have been different, thereby undermining confidence in the verdict.

¶ 49   Accordingly, we conclude the failure to preserve the silent video in this case does not constitute a *Brady* violation. *Beaman*, 229 Ill. 2d at 73-74.

¶ 50             III. CONCLUSION

¶ 51   For the reasons stated, we affirm the judgment of the circuit court of Bureau County.

¶ 52   Affirmed.