THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
ANTHONY JONES, Defendant-Appellant.

First District (5th Division) No. 82—320

Opinion filed May 13, 1983.

James J. Doherty, Public Defender, of Chicago (Suzanne M. Xinos, Assistant Public Defender, of counsel), for appellant.

Richard M. Daley, State's Attorney, of Chicago (Michael E. Shabat, Bruce A. Cardello, and Matthew J. Egan, Assistant State's Attorneys, of counsel), for the People.

JUSTICE SULLIVAN delivered the opinion of the court:

After being convicted by a jury, defendant was sentenced to concurrent terms of six years for rape and one year for unlawful restraint.[1] On appeal, he contends that (1) the trial court erred in (a) denying his motion to quash his arrest, (b) allowing identification testimony which was the product of that unlawful arrest, and (c) refusing to admit a photograph of the crime scene; (2) he was denied a fair trial when the State used its peremptory challenges to exclude blacks from the jury; (3) he was not proved guilty beyond a reasonable doubt; (4) he was denied his constitutional right to confront witnesses against him by the trial court's failure to exclude inadmissible and prejudicial hearsay evidence; and (5) he was improperly convicted of and sentenced for both crimes since they arose out of a single transaction.

At a hearing on his motion to quash his arrest and suppress

---

[1] In the same trial, codefendant Raleigh Harris, who has not appealed, was found not guilty of rape but guilty of unlawful restraint.

lineup identifications, defendant testified that he was arrested at approximately 3 a.m. on June 15, 1980, as he stood on the porch of his home. He had spent the entire evening at home watching television with his family, but he and his brother, Raleigh Harris, left the house at about 3 a.m. Harris walked to a restaurant to get a sandwich while he (defendant) walked his dog. When arrested, he was standing on the porch with his dog and was clad only in black slacks and gym shoes.

Officer Raitano testified that he and his partner responded to a radio call of a rape in progress and were met at the scene by the victim and Jerome Chudnow. The latter told them that the offenders were two male blacks who had just run south. The officers, with Chudnow in their car, were driving south in pursuit when they saw two male blacks running through a well-lighted alley about a block and a half from the scene of the rape. When Chudnow said, "Those are the two," the officers pursued them and arrested one (Harris) in the 1900 block of North Albany. Chudnow identified him as one of the men involved in the rape, and he then described the other as a male black, approximately six feet tall, who was very muscular and wore brown pants. Raitano also testified that, while his initial view of the men in the alley was brief and although he lost sight of them for about five seconds during the chase, he was sure that Harris was one of them and that the other was tall and very muscular.

Officer Penkala testified that he and his partner heard the original report of a rape in progress, and they were in the 1900 block of North Albany when they received another report that officers were in pursuit of a second person involved in a rape who was described as a muscular male black, six feet tall, and wearing brown pants. As they drove south on Albany, they were told by an unidentified woman that a male black had run south past her a few seconds before. A half block further, about two or three blocks from the rape scene, they saw defendant, a tall, muscular male black wearing brown pants, sitting on a porch. He was out of breath, and not seeing anyone else in the area, they placed him under arrest. They did not see a dog on the porch.

Defendant's sister testified that she was awakened at 3:15 a.m. by the sound of voices and a dog barking. When she looked out the window, the police were putting her brother into a squad car, and she noticed that their dog was on the porch.

Defendant's motion to suppress was denied, and at trial the victim testified that she left a family party about 12:30 a.m. with a friend who was to drive her home. In the car, they argued and she got out, intending to walk the rest of the way home. As she walked, a Puerto

Rican man came up to her, held a gun to her throat, and forced her into nearby Palmer Square Park. He said that he was going to rape her and threatened to kill her if she screamed. She persuaded him to come home with her, hoping that once out of the park she could find help, but as they walked out of the park defendant and Harris approached, and one of them grabbed her while the Puerto Rican pulled a gun, and she started to run but was caught by defendant and dragged into the park under a streetlight where he beat her repeatedly about the face, bit her, tore her clothes, and raped her. She noticed that defendant wore a white shirt and a cap and that Harris wore a blue shirt. When another man approached, defendant and Harris ran away. The police arrived immediately thereafter and took her to the hospital. Later that day, she went to the police station and identified defendant and Harris in a lineup. She acknowledged that she was in the park with the Puerto Rican for a long time but said that he did not strike her or tear her clothes. She did not speak to police officers at the scene, explaining that she does not speak English, and she said that Harris did not strike or rape her.

Jerome Chudnow testified that he was in his home across from Palmer Square when he heard a commotion and, upon looking out the window, saw a Puerto Rican with a gun in his hand pointed at Harris and another man dragging a woman out of the street into the park. He (Chudnow) told a friend to call the police, and after hearing Harris say, "The gun is a toy," he went out and walked down the street to a point in front of a church directly across the street from defendant and the woman, and when defendant looked up, he (Chudnow) had a clear view of his face. At this point, the police car approached, and the two men ran south through the park and down Albany where they entered an alley. He noted that Harris wore light slacks and a blue shirt, while defendant wore dark brown pants, a white dress shirt, gym shoes, and a golf cap. He told the officers that a rape had occurred, and he got into the squad car, which was driven across the park after the fleeing men. The squad car was driven into the alley where he had last seen the two men, and he saw them again. The officers turned on their headlights and, as they came closer, the men started to run away. He was able to see that they were dressed the same as the men he had seen in the park, but he could not see their faces. One officer jumped out of the car and caught Harris, who was breathing heavily. He (Chudnow) accompanied the officers to the police station, where he saw other officers bringing in defendant whom he identified as the other man in the park. At the station, defendant was wearing only pants and gym shoes.

Officer Restivo testified that when he and his partner were flagged down by Chudnow at about 3 a.m., he saw the victim and noted that her knees were bleeding, her clothes were in disarray, and she was sobbing. Chudnow told them that the victim was raped and that the two men involved ran south on Albany. With Chudnow in their car to direct them, they pursued the two men and, upon entering an alley off Albany, they saw two men walking halfway down the alley. The two men turned and, seeing the police car, they began running. The officers broadcast the details of the pursuit, describing one of the men as being approximately five feet seven inches tall, wearing light pants with a blue shirt, and the other about six feet tall, wearing a light shirt and dark pants. Restivo pursued and caught the man in the blue shirt, and Chudnow identified him as one of the men in the park. Restivo acknowledged that he first saw the two individuals when they were in the alley and twice lost sight of them for a few seconds during the pursuit.

Officer Saenz testified that when he heard that an officer was pursuing one of the subjects south, between Albany and Whipple, he and his partner proceeded to Albany. A woman walking her dog in the 1900 block of North Albany told them she had seen a black man running south on Albany. They proceeded south down Albany and saw defendant sitting on a porch. They saw no one else in the vicinity and, noticing that he was six feet tall, wore brown pants and gym shoes, and that he was panting heavily and sweating, they placed him under arrest. He admitted that defendant did not try to run away when they approached him.

Investigators for the public defender's office testified that they went to the scene of the rape on December 7, 1981, at approximately 12:30 p.m. and took a photograph of the park from a position at the bottom of the steps of a church across the street. They acknowledged that the picture did not accurately portray how the park looked at 3:15 a.m. on June 15, 1980, and that the measurements were not made with a tape measure but were paced off.

Defendant testified that he was arrested while sitting on his front porch at approximately 3:15 a.m. He was at home with his sisters and brother Harris from 9:30 p.m. until the time of his arrest, but Harris left the house at about 3 a.m. to walk to a nearby restaurant. When arrested, he was wearing only black pants and gym shoes and had not been running. He acknowledged that his brother was wearing beige pants and a blue shirt on the night in question, and that his sisters were asleep at the time of his arrest.

Sharon Jones, the defendant's sister, testified that she and her

sisters were asleep when defendant was arrested, but he and Harris had been at home with the family all evening. She admitted that she did not know where her brothers were between 2:15 and 3:15 a.m.

OPINION

Defendant first contends that the trial court erred in refusing to quash his arrest and to exclude identification testimony which was a product thereof. He maintains that the general description given by an eyewitness, absent other supporting facts connecting him to the crime, did not provide reasonable grounds for his arrest. Furthermore, he argues, his pretrial motion should have been granted because there was no testimony establishing the reliability of an eyewitness-informant's conclusion that defendant was a participant.

A warrantless arrest is invalid unless there is probable cause to believe that the person is committing or has committed an offense (*People v. Coleman* (1978), 63 Ill. App. 3d 814, 380 N.E.2d 829), and the test is whether, when the situation confronting the arresting officer is viewed objectively (*People v. Thomas* (1980), 80 Ill. App. 3d 1121, 400 N.E.2d 1019), we can say that the "facts and circumstances within the arresting officer's knowledge are sufficient to warrant a man of reasonable caution in believing" the person to be arrested has committed a crime (*People v. Lippert* (1982), 89 Ill. 2d 171, 178, 432 N.E.2d 605, 608, *cert. denied* (1982), ___ U.S. ___, 74 L. Ed. 2d 85, 103 S. Ct. 92), bearing in mind that we are dealing with probabilities (*People v. Spencer* (1982), 107 Ill. App. 3d 835, 438 N.E.2d 603), not proof beyond a reasonable doubt (*People v. Blitz* (1977), 68 Ill. 2d 287, 369 N.E.2d 1238, *cert. denied* (1978), 435 U.S. 974, 56 L. Ed. 2d 68, 98 S. Ct. 1622), and often "police officers must act upon a quick appraisal of the data before them and *** the reasonableness of their conduct must be judged on the basis of their responsibility to prevent crime and to catch criminals" (*People v. Walls* (1980), 87 Ill. App. 3d 256, 263, 408 N.E.2d 1056, 1062). On a motion to quash an arrest, the burden of proof is on the defendant (*People v. Robinson* (1980), 91 Ill. App. 3d 1138, 415 N.E.2d 585), but once he has made a *prima facie* showing of the lack of probable cause, the burden of going forward with the evidence shifts to the State (*People v. Garcia* (1981), 94 Ill. App. 3d 940, 419 N.E.2d 542), and where the arresting officer has relied on information provided by an informant, the evidence must indicate both the reliability of the person providing information and the reliability of his conclusion that defendant was involved in a crime (*Aguilar v. Texas* (1964), 378 U.S. 108, 12 L. Ed. 2d 723, 84 S. Ct. 1509). Once the trial court finds that probable cause for

the arrest existed, its determination will not be disturbed unless manifestly erroneous (*People v. Brown* (1980), 88 Ill. App. 3d 514, 410 N.E.2d 505, *cert. denied* (1981), 451 U.S. 1019, 69 L. Ed. 2d 392, 101 S. Ct. 3010) and, since a ruling on a motion to suppress is not final and can be reversed at any time, a reviewing court may consider evidence subsequently received during trial (*People v. Taylor* (1981), 99 Ill. App. 3d 15, 424 N.E.2d 1246).

 Initially, defendant argues that the sole basis for his arrest was a general description provided by an eyewitness, who first stated that he saw "two male Negroes," and later, when Harris was arrested, he supplemented this with the information that the other man was tall and muscular and wore brown pants, a white shirt, gym shoes, and a hat. While it is true, as defendant asserts, that a general description standing alone is insufficient to justify an arrest (*People v. Gabbard* (1979), 78 Ill. 2d 88, 398 N.E.2d 574; *In re Woods* (1974), 20 Ill. App. 3d 641, 314 N.E.2d 606), we believe that the arrest in the instant case was based on more than a mere general description. Officers arrived at the scene of the rape at 3:10 a.m., within moments of its occurrence, and observed that the victim was sobbing, her knees were bleeding, and her clothing was in disarray. A witness told them that he observed the crime and saw the two offenders flee into a nearby alley. The witness went with them in the squad car and when they entered the alley, they saw two men, and the witness exclaimed, "Those are the two." The officers pursued them and also sent a radio message containing their description to other officers in the area. One of the arresting officers testified that he heard the description and the information that a suspect was running in the vicinity of 1900 North Albany. There, the officer was told by a passerby that a man ran past her seconds before the officer arrived. One-half block from that point, and only two or three blocks from the scene of the offense, the officers came upon defendant. Because he matched the description and was panting heavily, he was arrested. All of this took place within five minutes after the rape occurred, and no other person was observed in the vicinity, although several police cars were searching the area.

 These same circumstances were found sufficient to establish probable cause in *People v. Lippert* (1982), 89 Ill. 2d 171, 432 N.E.2d 605, and *People v. Coleman* (1978), 63 Ill. App. 3d 814, 380 N.E.2d 829. In *Lippert*, the victims told an officer that they had been robbed by four men in a car approximately 25 minutes before the officer arrived. Only two of the offenders were described, and no description of the car was given. As the officer cruised the area minutes later, he saw

two men who matched the description alone in a car and arrested them. The supreme court held that the officer's knowledge was sufficient to constitute probable cause, noting that he knew an armed robbery was committed, had a general description of two men involved, and began searching the area within 30 minutes of the crime. The court also considered the fact that, because of the lateness of the hour, there were only a few people in the area.

Similarly, in *Coleman*, a victim saw two men trying to steal his car at 6:30 a.m. He called to an officer, who saw the men get out of the car and flee. One was apprehended, and a radio message was sent detailing the pursuit and describing the second suspect as a male black, five feet six inches tall, with dark curly hair, and wearing dark clothing. Another officer arrested the defendant minutes later, within eight blocks of the scene, after noting that he fit the general description and was breathing heavily. He found that there was probable cause for the arrest, noting that the officer knew that a crime had recently been committed in the area, that there were no other individuals in the area at that early hour of the morning, and that the defendant matched the general description and was breathing heavily.

Although we believe that these cases are dispositive of the issue, we note the additional argument of defendant that, because the eyewitness did not testify at the suppression hearing, there was no basis upon which the court could determine that he was reliable. He admits that an officer may rely on information supplied by a private citizen (*People v. Spencer* (1982), 107 Ill. App. 3d 835, 438 N.E.2d 603), but maintains that the State failed to show any underlying facts or circumstances from which the court could conclude that the informant had reason to know that the defendant was engaged in criminal activity (*People v. Garcia* (1981), 94 Ill. App. 3d 940, 419 N.E.2d 542). In the instant case, however, the eyewitness did testify at trial, detailed what he saw, and established his ability to see defendant clearly during the commission of the crime. This evidence satisfies the second prong of the *Aguilar* test, and defendant therefore "cannot avail himself of any error on the motion to suppress." (*People v. Braden* (1966), 34 Ill. 2d 516, 520, 216 N.E.2d 808, 810.) Since we have determined that probable cause existed, any identifications following therefrom were admissible against defendant. *People v. Hinton* (1977), 45 Ill. App. 3d 925, 360 N.E.2d 451.

 Defendant next contends that he was denied a fair trial by the State's use of its peremptory challenges to exclude blacks from the jury and, in support thereof, cites *People v. Payne* (1982), 106 Ill.

App. 3d 1034, 436 N.E.2d 1046.[2] He points out that the prosecutor exercised seven peremptory challenges, four of them against black members of the venire, and as a result only one black served on the jury.

In *Payne*, the prosecutor exercised eight peremptory challenges, six of them against blacks, and thus only one black remained on the jury. In reversing the defendant's conviction, the third division of this court held that "when it reasonably appears to the trial court, either by its own observation or after motion by the defendant, that the prosecuting attorney is using peremptory challenges to systematically exclude blacks from the jury solely because they are blacks, the court should require the prosecutor to demonstrate, by whatever facts and circumstances exist, that blacks were not being systematically excluded from the jury solely because they were blacks." (106 Ill. App. 3d 1034, 1040, 436 N.E.2d 1046, 1050.) The *Payne* court noted that its decision was contrary to *Swain v. Alabama* (1965), 380 U.S. 202, 13 L. Ed. 2d 759, 85 S. Ct. 824, and *People v. Butler* (1970), 46 Ill. 2d 162, 263 N.E.2d 89, which hold that defendant must prove systematic exclusion of blacks in case after case in order to prevail. (See also *People v. Davis* (1983), 95 Ill. 2d 1.) The *Payne* court reasoned that *Swain* was distinguishable because it was decided under the equal protection clause of the fourteenth amendment (U.S. Const., amend XIV); whereas, *Payne* relied on the sixth amendment guarantee of a fair and impartial jury (U.S. Const., amend. VI; see *People v. Gilliard* (1983), 112 Ill. App. 3d 799, 804, 445 N.E.2d 1293, 1297). *Payne* draws its reasoning and conclusions in great part from *People v. Wheeler* (1978), 22 Cal. 3d 258, 583 P.2d 748, 148 Cal. Rptr. 890, and *Commonwealth v. Soares* (1979), 377 Mass. 461, 387 N.E.2d 499, *cert. denied* (1979), 444 U.S. 881, 62 L. Ed. 2d 110, 100 S. Ct. 170,[3] which rely on provisions of their respective State constitutions guaranteeing, as does the sixth amendment, a fair and impartial jury. *Wheeler* and

---

[2]Presently before our supreme court on leave to appeal. The division of this court which authored *Payne* has reaffirmed its position in *People v. Gilliard* (1983), 112 Ill. App. 3d 799, 445 N.E.2d 1293, and *People v. Gosberry* (1982), 109 Ill. App. 3d 674, 440 N.E.2d 954. Two other divisions have rejected *Payne* (*People v. Newsome* (1982), 110 Ill. App. 3d 1043, 443 N.E.2d 634, and *People v. Teague* (1982), 108 Ill. App. 3d 891, 439 N.E.2d 1066), as have courts in other appellate districts (*People v. Osborn* (1983), 111 Ill. App. 3d 1078, 444 N.E.2d 1158; *People v. Baylor* (1982), 111 Ill. App. 3d 286, 443 N.E.2d 1137).

[3]Prior to *Payne*, this court expressly rejected the reasoning of *Wheeler* and *Soares. People v. Mims* (1981), 103 Ill. App. 3d 673, 431 N.E.2d 1126; *People v. Lavinder* (1981), 102 Ill. App. 3d 662, 430 N.E.2d 243; *People v. Fleming* (1980), 91 Ill. App. 3d 99, 413 N.E.2d 1330.

*Soares,* along with *Payne,* either ignore or distinguish *Swain* and rely instead on *Taylor v. Louisiana* (1975), 419 U.S. 522, 42 L. Ed. 2d 690, 95 S. Ct. 692, which holds that exclusion of a discrete group in selecting the venire violates the sixth amendment guarantee of an impartial jury trial in criminal prosecutions.

After defendant filed his brief in the instant case, the Illinois Supreme Court rendered its decision in *People v. Davis* (1983), 95 Ill. 2d 1, which was on direct appeal because of the death penalty imposed. There, the defendant alleged that the State used its peremptory challenges to exclude blacks, thus depriving him of his right to a fair and impartial jury. The supreme court stated that "[t]his contention has been resolved adversely to the defendant in *Swain v. Alabama* ***." (95 Ill. 2d 1, 16.) It discussed the rejection of *Swain* by the courts in *Wheeler* and *Soares,* the cases relied upon in *Payne,* and disagreeing with their reasoning, stated:

> "However, we are not disposed to depart from the principle enunciated in *Swain.* 'Peremptory challenges historically and by definition, are arbitrary and perhaps even irrational challenges to the seating of a juror. They are totally subjective and not subject to scrutiny or examination. *** [T]he Court in *Swain* pointed out that to entertain objections of the nature raised in this case would be to destroy the peremptory nature of the challenge ***.' *Commonwealth v. Henderson* (1981), 497 Pa. 23, 29-30, 438 A.2d 951, 954." 95 Ill. 2d 1, 17.[4]

It is established that once our supreme court declares the law on any point, its decision is binding on all Illinois courts (*People v. Reese* (1978), 66 Ill. App. 3d 199, 383 N.E.2d 759), and we may not refuse to follow it, whatever our personal views of that decision might be (*People v. O'Neal* (1976), 40 Ill. App. 3d 448, 352 N.E.2d 282, *cert. denied* (1977), 431 U.S. 969, 53 L. Ed. 2d 1065, 97 S. Ct. 2929), because the supreme court alone has the power to overrule or modify its decisions (*People v. Tannahill* (1976), 38 Ill. App. 3d 767, 348 N.E.2d 847). In the instant case, however, while defendant agreed during oral argument that the above-quoted language in *Davis* appears to be dispositive of the issue here, he argued that we should not so consider it because (a) it is merely *dictum* which we should not follow, and (b) it is based on the equal protection clause of the fourteenth amendment

---

[4]In the case cited, the Pennsylvania Supreme Court also expressly rejects the reasoning of *Wheeler* and *Soares,* as have the New York Court of Appeals (*People v. McCray* (1982), 57 N.Y. 2d 542, 443 N.E.2d 915) and the District of Columbia Court of Appeals (*Doepel v. United States* (D.C. App. 1981), 434 A.2d 449). But see *State v. Crespin* (1980), 94 N.M. 486, 612 P.2d 716.

and is therefore not dispositive of the sixth amendment argument addressed in *Payne*.

We believe, however, that defendant's arguments are disposed of by the supreme court's recent order issued in *People v. Gosberry* (1983), 93 Ill. 2d 544. There, the supreme court in the exercise of its supervisory jurisdiction, reversed this court's decision, which was based solely on *Payne*, that the defendant was denied his constitutional right to a fair and impartial jury by the prosecutor's use of peremptory challenges to exclude blacks from the jury. (*People v. Gosberry* (1982), 109 Ill. App. 3d 674, 440 N.E.2d 954.) The supreme court relied on *Davis* in reversing *Gosberry*; therefore, it would appear that the holding in *Davis* is not *dictum*, and since *Gosberry* is based entirely on the sixth amendment, we conclude that *Davis* is dispositive of this issue.

Our conclusion is bolstered by an analysis of the *Davis* decision itself. In arguing that the *Davis* court's reliance on *Swain* is *dictum*, defendant relies upon a comment in *Davis* that the record "[did] not reveal the number of black jurors called for service." (95 Ill. 2d 1, 16.) Defendant concludes that the court's decision was based on the inadequacy of the record before it rather than on a holding that the State's use of peremptory challenges to exclude blacks from a particular jury does not deprive the defendant of his constitutional right to a fair and impartial jury. However, the supreme court also stated in *Davis* that in order to prevail, the defendant had to establish a systematic and purposeful exclusion of blacks in case after case, and the quoted language relied on by defendant appears in the court's discussion of the defendant's failure to meet this burden of proof. We believe that, had the court meant to find that the issue was not properly presented by the record before it, it would have cited *People v. Gaines* (1981), 88 Ill. 2d 342, 430 N.E.2d 1046, *cert. denied* (1982), 456 U.S. 1001, 73 L. Ed. 2d 1295, 102 S. Ct. 2034, where it refused to consider the issues raised in *Wheeler* and *Soares* because the record did not reveal necessary factual information on the racial composition of the jury.

We find it difficult to accept another assertion of defendant that we should not consider *Davis* as controlling because it fails to address the sixth amendment argument, on which *Payne* is based. Initially, we note that *Davis* states the issue as "whether the State's use of peremptory challenges to allegedly obtain an all-white jury deprived defendant of his *right to a fair and impartial jury*." (Emphasis added.) (95 Ill. 2d 1, 16.) This language clearly addresses the sixth amendment, rather than the fourteenth amendment. Furthermore, the reasoning of *Wheeler* and *Soares*, relied upon in *Payne*, which was

based upon a sixth amendment rationale,[5] was expressly rejected by *Davis*. (95 Ill. 2d 1, 17.) This rejection was in the face of the one-justice dissent in *Davis*, which quotes from *Payne* and points out the sixth amendment right as recognized in *Taylor v. Louisiana*. (95 Ill. 2d 1, 58-59.) We do not believe, as defendant's argument suggests, that the supreme court rejected these opinions without reading them, or that it is unfamiliar with the sixth amendment guarantee of an impartial jury. For these reasons, it is our view that *Davis* supports the rejection of defendant's contention that he was denied a fair trial by the State's use of peremptory challenges.

■ Defendant further argues that he was not proved guilty beyond a reasonable doubt. He bases his argument on the alleged inadequacy of the witnesses' opportunity to observe and contradictions in the details of the offender's description.

The State has the burden of proving beyond a reasonable doubt that a crime occurred and that the accused is the person who committed it (*People v. Bridges* (1979), 71 Ill. App. 3d 868, 390 N.E.2d 407), but the latter burden may be met by offering a positive identification by a single witness who had an adequate opportunity to observe the offender (*People v. Smith* (1982), 111 Ill. App. 3d 895, 444 N.E.2d 801) even if the circumstances of the observation are less than perfect (*People v. Lomax* (1980), 89 Ill. App. 3d 651, 411 N.E.2d 1212). It is the jury's province to determine whether the State has met this burden (*People v. McDonald* (1975), 62 Ill. 2d 448, 343 N.E.2d 489); therefore, the "[r]esolution of factual disputes and the assessment of the credibility of the witnesses" is for the jurors (*People v. Williams* (1983), 93 Ill. 2d 309, 315, 444 N.E.2d 136, 138), and we will not substitute our judgment for theirs unless the evidence itself is so improbable as to raise a reasonable doubt of defendant's guilt (*People v. Carlson* (1980), 79 Ill. 2d 564, 404 N.E.2d 233).

In the instant case, the victim testified that she had a clear view of defendant's face when he and Harris first approached her, and again as he raped her under a streetlight. An eyewitness also testified that defendant, while under a streetlight, looked directly at him, and that his view of defendant's face was clear and unobstructed. We note that each witness identified defendant later despite the fact that he was no longer wearing a cap or a white shirt as he was during the commission of the crime. While defendant maintains that the cap worn by the offender would have cast a shadow on his face and pre-

---

[5]Although based on provisions of their State constitutions, they essentially concern the same right to an impartial jury as provided by the sixth amendment.

vented his identification, we note that there was no such testimony, and the jury might well have believed that the brim of a golf cap, as a witness described his head covering, would not have produced such a large shadow as to totally obscure defendant's features. Defendant further argues that the victim's ability to observe was limited by the severe beating she sustained and by her fear, and that the eyewitness was too far away to have a clear view of the offender's face. These factors were before the jury and were vigorously argued by defense counsel in his closing argument. The jury could have found the witnesses credible in spite of the imperfect circumstances, since a victim's attention would naturally be focused on her attacker, whose face was in close proximity to hers for a period of time, and the eyewitness too might be particularly attentive, knowing that he was witnessing a crime and might later be called upon to describe it.

Defendant also maintains that there were discrepancies in the witnesses' description of the offender, and notes that Chudnow did not give a full description until after he saw the two men in the alley, suggesting that it was influenced more by his view of the men in the alley than by his observations at the scene. However, Chudnow testified that when he saw the two men in the alley, he noted that their clothing was the same as the men he saw in the park, thus negating defendant's theory on the origin of Chudnow's description. Furthermore, we do not believe that the failure to obtain the description at the scene indicates that the witnesses could not provide one, or that their later descriptions "contradict" their failure to give a description initially. The victim stated that she did not speak English and was therefore unable to communicate with the officers at the scene, and it does not appear that a description was asked from the other witness at the scene by the officers who, instead, asked him to accompany them in their immediate pursuit of the offenders.

Defendant further argues that his attire at the time of his arrest negates any possibility of his guilt. He notes that the offender was described as wearing a white shirt and cap, while he was shirtless and hatless, positing that he could not have arrived home, shed the incriminating clothing, and returned to the porch before the police came. However, it is not unreasonable to assume that they were discarded as defendant fled in an attempt to avoid capture.

It is our view that the evidence was not so improbable as to raise a reasonable doubt as to defendant's guilt.

■ Defendant also contends that the trial court erred in refusing to exclude alleged hearsay evidence. Over defendant's objection, the arresting officer testified that, during his pursuit of the fleeing sus-

pect, an unidentified woman told him she saw a man running south on Albany. Defendant was arrested immediately thereafter on Albany, one-half block south of the site of this conversation.

Hearsay is "testimony of an out-of-court statement offered to establish the truth of the matter asserted therein, and resting for its value upon the credibility of the out-of-court asserter" (*People v. Rogers* (1980), 81 Ill. 2d 571, 577, 411 N.E.2d 223, 226), and with certain exceptions, such testimony is inadmissible at trial because the party against whom it is offered has no opportunity to test the absent declarant's credibility (*People v. Langdon* (1980), 91 Ill. App. 3d 1050, 415 N.E.2d 578); however, statements which would be hearsay if offered for the truth of the matter asserted therein may be admissible if offered for the limited purpose of explaining why the police conducted their investigation as they did (*People v. Sanders* (1980), 80 Ill. App. 3d 809, 400 N.E.2d 468) or why they arrested the defendant (*People v. Romo* (1980), 85 Ill. App. 3d 886, 407 N.E.2d 661). Furthermore, the admission of hearsay evidence is harmless error where there is uncontroverted eyewitness testimony sufficient to sustain a conviction (*People v. Gaines* (1982), 88 Ill. 2d 342, 430 N.E.2d 1046, *cert. denied* (1982), 456 U.S. 1001, 73 L. Ed. 2d 1295, 102 S. Ct. 2034) since, in that event, there is no reasonable possibility that the verdict would have been different had the hearsay been excluded (*People v. Griggs* (1982), 104 Ill. App. 3d 527, 432 N.E.2d 1176).

Defendant maintains that the testimony was offered to prove the truth of the matter asserted therein—that a man was running south on Albany. The State argues that its only purpose in offering this testimony was to explain why the officers proceeded south on Albany, therefore the statement was properly admitted to explain the circumstances of defendant's arrest. Recently, in *People v. Agee* (1980), 85 Ill. App. 3d 74, 405 N.E.2d 1245, we found remarkably similar testimony admissible for the limited purpose of explaining the investigatory procedures undertaken by a security guard. There, the victim testified that he was robbed in an apartment building elevator by three boys. He proceeded to the lobby, where he told a security guard of the robbery, and an unidentified woman standing nearby stated that she had seen three boys on the 15th floor. The guard immediately went to an apartment on the 15th floor, where one of the defendants lived, but was refused admittance. There, as here, the woman did not describe the persons she saw, nor did her statement connect them with the crime charged. We believe that here, as in *Agee*, the only value in this testimony was to explain the officer's subsequent conduct, since in neither case did the statement identify the defendant as

the person observed, nor did it link the person observed to the crime.

Moreover, even assuming that the statement was offered to prove the truth of the matter asserted, we believe that its admission was harmless in the light of the overwhelming evidence of defendant's guilt. Two eyewitnesses with an adequate opportunity to observe identified defendant as the perpetrator. Furthermore, the circumstances of his arrest logically tend to connect him with the crime, since he was arrested within minutes thereafter, only two or three blocks from the scene, and his physical condition at the time of his arrest indicated that he had been running, which is consistent with police testimony that the suspect fled from the scene on foot.

Defendant next contends that the trial court erred in refusing to admit a photograph of the crime scene into evidence. He argues that, given the conflicting testimony on how far the eyewitness was from defendant during his observation, the photograph was relevant and would have aided the jury in resolving this factual dispute.

Ordinarily, it is within the discretion of the trial court whether or not to admit a photograph into evidence (*People v. Williams* (1979), 71 Ill. App. 3d 547, 390 N.E.2d 32), based on its consideration of the photograph's probative value as opposed to its prejudicial effect (*People v. Greer* (1980), 79 Ill. 2d 103, 402 N.E.2d 203) and a determination whether it portrays facts relevant to an issue and can be verified as a correct representation of those facts (*People v. Williams* (1979), 71 Ill. App. 3d 547, 390 N.E.2d 32), and its decision will not be reversed absent a showing of an abuse of that discretion and resulting prejudice to the defendant (*People v. Craig* (1977), 47 Ill. App. 3d 242, 361 N.E.2d 736).

We have examined the photograph in question, which purports to be the view which Chudnow would have had of the scene from his vantage point in front of the church. The witness who took the picture admitted that it did not portray the scene as it would have appeared at 3:15 a.m. on the day of the crime, since it was taken at 12:30 p.m., almost 18 months later. While the man who appears in the photograph was presumably standing approximately where defendant would have been on the night in question, we note that the photograph was taken from the bottom of the church steps, approximately 36 feet from the curb, although Chudnow testified that he stood "in front of the church," but did not state whether he was at the curb, at the steps, or at some point between them. In addition, the other man in the photograph was standing in the middle of a jogging path, approximately 12 feet from the opposite curb; whereas, Chudnow testified that defendant was "near" the path, about four feet from the

curb. Thus, while the picture suggests a distance of 114 feet, Chudnow might have been substantially closer to defendant than that, perhaps as much as 44 feet closer. For these reasons, we do not believe that the trial court abused its discretion, since the photograph admittedly does not accurately portray the scene as it appeared at the time of the crime (see *People v. Williams* (1979), 71 Ill. App. 3d 547, 390 N.E.2d 32) and might have given the jury a misleading impression of the view Chudnow had of the crime (see *People v. Rolon* (1979), 71 Ill. App. 3d 746, 390 N.E.2d 107).

Furthermore, even assuming *arguendo* that the photograph should have been admitted, we believe that its exclusion was harmless error in this case. While it might have cast some doubt on the credibility of Chudnow's identification, the victim's positive identification after an opportunity to observe defendant at close range was sufficient to support conviction even in the absence of Chudnow's corroboration. See *People v. Smith* (1982), 111 Ill. App. 3d 895, 444 N.E.2d 801.

■■ Finally, defendant contends that his conviction and sentencing for both rape and unlawful restraint were improper. He argues that the offenses occurred as part of a single transaction involving a single victim; therefore, he asserts, his conviction for unlawful restraint must be vacated.

Defendant correctly states that "where there [is] a single act, there [can] be but one conviction of crime" (*People v. Donaldson* (1982), 91 Ill. 2d 164, 168, 435 N.E.2d 477, 478); however, "when more than one offense arises from a series of incidental or closely related acts and the offenses are not, by definition, lesser included offenses, convictions with concurrent sentences can be entered" (*People v. King* (1977), 66 Ill. 2d 551, 566, 363 N.E.2d 838, 845, *cert. denied* (1977), 434 U.S. 894, 54 L. Ed. 2d 181, 98 S. Ct. 273). The State argues that the crimes in question did not arise from the same physical act, positing that the crime of unlawful restraint was completed when defendant ran after the victim and grabbed her as she attempted to escape; whereas, the rape did not occur until after he dragged her into the park, threw her to the ground, and ripped her clothing.

This issue has arisen in three recent cases. In *People v. Bachman* (1981), 92 Ill. App. 3d 419, 414 N.E.2d 1369, the defendant grabbed the victim as she sat in a truck, choked her, and threatened to rape her. In an effort to delay him, the victim suggested that they leave the truck. The defendant then took the victim to a nearby corn crib and raped her. In *People v. Coleman* (1980), 83 Ill. App. 3d 429, 403 N.E.2d 1266, the defendant confronted the victim with a gun and ordered her to disrobe, but she refused. He then forced her into another

room and raped her. Afterward, when the victim asked if she could leave, the defendant refused. Finally, in *People v. McCann* (1979), 76 Ill. App. 3d 184, 394 N.E.2d 1055, the victim was hitchhiking when the defendant picked her up, grabbed her by the hair, locked the car doors, and held a knife to her throat. They then drove a short distance before the defendant parked the car and raped her. In each case, the court found that "there were not two acts committed which were sufficient to support convictions for both rape and unlawful restraint" (*People v. Bachman* (1981), 92 Ill. App. 3d 419, 421, 414 N.E.2d 1369, 1371) and vacated the defendant's conviction for unlawful restraint.

The State maintains that these cases are distinguishable, arguing that, in each, "the unlawful restraint occurred virtually simultaneously with the rape"; whereas, here, "the criminal conduct by defendant which constituted the unlawful restraint was separate and distinct in both time and distance from that which constituted the rape." However, we believe that the above cited cases are analogous to the present situation. Here, as in *Bachman*, *Coleman*, and *McCann*, the victim was first restrained, then taken to another location where she was raped. None of the cases indicate what length of time elapsed between the initial restraint and the subsequent rape, although in each it appears that, as here, the time period was relatively short. Therefore, we believe that the two crimes arose out of a single act, and defendant's conviction for the lesser offense of unlawful restraint must be vacated. *People v. Donaldson* (1982), 91 Ill. 2d 164, 435 N.E.2d 477.

For the reasons stated, defendant's conviction and sentence for rape are affirmed, and his conviction and sentence for unlawful restraint are vacated.

Affirmed in part; vacated in part.

WILSON, P.J., and LORENZ, J., concur.