2023 IL App (1st) 221263-U

No. 1-22-1263

THIRD DIVISION
October 25, 2023

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 16 CR 6917 |
| | ) | |
| LAMAR WILLIAMS, | ) | Honorable |
| | ) | Mary Margaret Brosnahan, |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

JUSTICE D. B. WALKER delivered the judgment of the court.
Presiding Justice Reyes and Justice Lampkin concurred in the judgment.

**ORDER**

¶ 1    *Held*: Defendant's conviction and sentence are affirmed where the State established a proper foundation for the video recording to be admitted as evidence, and defendant's sentence was not excessive.

¶ 2    Defendant Lamar Williams was convicted of first degree murder after a jury trial, and sentenced to 65 years in prison, for the shooting death of Johnathan Sanchez-Rosales. On appeal, defendant contends (1) his conviction should be reversed where the trial court admitted a video

showing Johnathan being shot without a proper foundation, and (2) his sentence should be vacated or lessened where defendant was only 24 years old at the time of the offense, and the trial court imposed a *de facto* life sentence without sufficient consideration of defendant's potential for rehabilitation or other mitigating factors. For the following reasons, we affirm.

¶ 3                                    I. BACKGROUND

¶ 4       The State charged defendant with first degree murder, aggravated unlawful use of a weapon, aggravated unlawful use of a weapon by a felon, and mob action in the April 7, 2016 shooting that killed Johnathan.

¶ 5       Prior to trial, defendant filed a motion *in limine* to limit or exclude testimony regarding a video recording of the shooting. The motion sought to exclude witness testimony about anything "that is not readily apparent in the video," as well as identification testimony based on the video because "the video speaks for itself." Defendant argued that the testimony would be unduly prejudicial. At the hearing on the motion, the State indicated that it did not intend to elicit such testimony. The trial court granted the motion without objection.

¶ 6       At trial, Maria Sanchez Rosales[1] testified that Johnathan was her son and they lived on the 4600 block of West Huron Street in Chicago, Illinois. On April 7, 2016, Johnathan, who was 23 years old, worked at a chocolate factory from 3:30 p.m. to 10:30 p.m. and was expected to return home by 11:30 p.m. Maria last spoke with Johnathan around 8 p.m. that evening.

¶ 7       Jose Gonzalez testified that on April 7, 2016, he worked as an armed security guard and lived on the 4700 block of West Huron. Around 11:50 p.m., he and his wife were unloading groceries from their car behind the house when he heard a single gunshot. The sound came from

---

[1]Although Johnathan's last name is hyphenated in portions of the record, his mother's last name has no hyphen.

the front of the house so Gonzalez, who was armed, walked through a gangway towards the front. He heard someone "tell somebody to get the f*** down." Across the street, he saw a man on the ground and a person standing above him with a rifle. Gonzalez observed two others standing nearby in a vacant lot that was "at an angle across the street" from his house. He could not see the face of the person holding the rifle but noticed that he was a black male wearing dark clothing. The people in the vacant lot were also black males. The man on the ground was "a Hispanic male."

¶ 8 As Gonzalez stood by the front gate of his house, he observed the man with the rifle shoot the man on the ground. He could see the flash from the muzzle. The shooter ran north through the vacant lot. Gonzalez then heard four to six more shots fired but he did not see those shots. Gonzalez called 911 and police arrived shortly thereafter.

¶ 9 When the State asked Gonzalez about a recording from a home surveillance camera, defense counsel objected to the video as evidence "[u]nless they can bring the witness who took the video." Counsel also questioned whether the recording accurately portrayed what Gonzalez observed because the video was taken with an infrared camera. The State responded that Gonzalez, who witnessed the shooting, would testify that the video accurately depicted what he had observed. In fact, the video showed Gonzalez approaching the police when they arrived at the scene. The court allowed the video evidence, admitted as People's Exhibit 5, because Gonzalez "says that it accurately portrays what he saw." The video was played in court.

¶ 10 The video shows Johnathan walking on the sidewalk and looking over his shoulder at the vacant lot, which is not visible in the recording. He briefly raises his hands and then lies down on the ground. While he is on the ground, a person approaches wearing dark pants with a reflective block on the lower right leg. The person stands over Johnathan holding a rifle. He points the rifle at Johnathan's head, and there is a small spark. The man steps back and appears to fire again before

leaving the scene through the vacant lot. Police officers arrive at the scene about two and a half minutes later. As they exit their vehicle to investigate, Gonzalez emerges from an area between two houses across the street.

¶ 11 On cross-examination, defense counsel asked Gonzalez about his 911 call. Gonzalez confirmed that he told the operator he heard six to seven shots fired, and he observed "three male blacks in black hoodies" running north towards Chicago Avenue from the vacant lot. When Gonzalez spoke with Detective Daquilante at his home, he told him he saw the shooting.

¶ 12 During redirect examination, Gonzalez viewed the video again. He identified his house on the video and indicated his location across the street from which he had observed the shooting. He also pointed to the person who was shot in the video. When asked whether "[t]hat's what you saw from your vantage point in person," Gonzalez answered, "Yes." He testified that although the video showed a reflective stripe on the shooter's pant leg, he did not personally observe the stripe when the shooting occurred.

¶ 13 Detective Patrick Graney testified that on April 7, 2016, around 11:51 p.m., he and his partner received a call regarding shots fired on the 4700 block of Huron. They were three blocks away, so they drove to the area to investigate. They found a person on the ground with a gunshot wound to his head. Gonzalez came forward and after speaking with Gonzalez, Detective Graney broadcast over the radio a description of the offenders. He described them as "three male blacks dressed in dark clothing *** running northbound through the vacant yards."

¶ 14 On cross-examination, Detective Graney testified that Gonzalez told him he heard the shooter tell Johnathan to "get down," but he did not say he observed the shooting.

¶ 15    Officers Sherry Tripp and Kevin Hawkins testified that they responded to the radio call about the shooting. Shortly thereafter, they located three black men in dark clothing on the 4900 block of Iowa, approximately seven blocks northwest of the location where Johnathan was shot.

¶ 16    Officer Tripp and her partner exited their vehicle to conduct a field interview. She identified defendant in court as one of the three men. The men wore dark clothing and "were breathing very heavy and sweating." When Officer Tripp began to speak, defendant fled and officers in an unmarked police vehicle chased him on foot.

¶ 17    Officer Hawkins testified that he was driving in an unmarked vehicle when he responded to the call regarding the shooting. As he drove westbound on Iowa, he observed "three male blacks in all black clothing *** walking westbound on that street." One of the men had "a white reflector design on his lower pant leg." Officer Hawkins identified defendant in court as that person. When Officer Hawkins exited his vehicle, defendant looked at him and "fled northbound." He chased defendant into an open lot on the 4900 block of Walton where defendant lost his footing and fell. Officer Hawkins then placed defendant into custody. Defendant was detained approximately five minutes after Officer Hawkins responded to the radio call.

¶ 18    An autopsy showed that Johnathan had multiple gunshot wounds to his head. His death was classified as a homicide caused by multiple gunshot wounds.

¶ 19    Police returned to the 4700 block of West Huron where they recovered a "super x" cartridge from the pavement. They also recovered seven spent 7.62 caliber cartridge cases. An empty extended clip magazine was recovered from the 4900 block of West Iowa. On the 4700 block of West Superior, a block north of where Johnathan was shot, police recovered fired cartridge cases and live ammunition. They also recovered a .22 caliber Ruger rifle and a 7.62 caliber SKS rifle. Blood was observed on both weapons. Police swabbed the rifles for DNA and fingerprint testing.

An evidence technician obtained a blood card standard and buccal swab from Johnathan. Buccal swabs were also obtained from defendant.

¶ 20    DNA analysis identified a mix of two DNA profiles on the swab taken from the SKS rifle. An Illinois State Police forensic scientist testified that defendant could not be excluded as a contributor to the major DNA profile identified on the rifle. She testified that the probability of a random person in the general population being a contributor to that profile was 1 in 140 septillion. Defendant's DNA profile also matched the profile found on the Ruger rifle. The probability of a random person in the general population having that DNA profile was 1 in 560 octillion. The remaining swabs were not suitable for DNA analysis. A partial fingerprint from the red dot scope attached to the Ruger rifle matched defendant's fingerprint standard.

¶ 21    A gunshot residue test administered on defendant's hands on April 8, 2016 was positive for gunshot residue. A positive result indicated that defendant "discharged the firearm, contacted a gunshot-residue related item, or had the right hand in the environment of a discharged firearm."

¶ 22    Marc Pomerance, a forensic scientist with the Illinois State Police, examined the rifles, recovered cartridges, and fired bullets. He concluded that the cartridge case recovered on West Superior was fired by the .22 Ruger rifle, and the seven 7.62 cartridges were fired from the SKS rifle. The fired bullet recovered from Johnathan came from a 7.62 caliber weapon. Although the markings on the bullet were consistent with the SKS rifle, Pomerance could not conclusively identify the bullet as fired from the SKS rifle. However, he could not exclude that possibility.

¶ 23    Police officers also recovered video recordings taken on April 7, 2016 from a gas station camera at 801 North Cicero Avenue and a Chicago Police POD camera at 4741 West Chicago Avenue, about two blocks north of the crime scene. The recordings were published to the jury.

¶ 24    The first recording from the POD camera, taken between 11:23 and 11:24 p.m. on April 7, 2016, shows a car dropping off three people in the alley and one has reflective stripes on his lower right pant leg. The second recording, taken between 11:53 and 11:55 p.m., shows the same three individuals returning to the alley and walking across a parking lot.

¶ 25    The gas station camera was located approximately three blocks northwest of the crime scene and one block from the area where police recovered the rifles. Video from that camera shows three men walking northwest across the gas station's property. One of the men is wearing dark pants with reflective material on the lower right pant leg. Officer Hawkins testified that he viewed the video and defendant was wearing the same pants when he was detained.

¶ 26    After the State rested its case, the defense proceeded by stipulation. The parties stipulated that Detective Daquilante would testify that he spoke with Gonzalez in the early morning hours of April 8, 2016, and Gonzalez told him that "one of the male subjects fired approximately five to six additional shots" and "all three of the subjects [ran] northbound through the vacant lot towards Superior Street." Although Gonzalez could not clearly see their faces, he could see that they were "male blacks *** in their 20s." Gonzalez did not tell the detective that he saw the shooting.

¶ 27    In its closing argument, the State played the video of the shooting and argued that the evidence showed defendant shot Johnathan. The State emphasized the reflective stripe on defendant's pant leg and the fact that gunshot residue was found on his hands. The evidence also showed that defendant intended to kill or cause great bodily harm when he shot Johnathan three times in the head. Furthermore, defendant's DNA was found on both recovered rifles, and the recovered shell casings and bullet were consistent with the SKS firearm.

¶ 28    Defense counsel argued in closing that defendant was the victim of a poorly conducted police investigation. There was no evidence that defendant and Johnathan knew each other, and

the police focused on defendant simply because he was found in the vicinity of the shooting. Also, Gonzalez could not identify the shooter. Regarding the video recording of the shooting, counsel argued that there was no evidence where the video came from or how the recording was made. Counsel pointed out that more than one DNA profile was found on the rifles and police never tested the clothing of the two men found with defendant for gunshot residue.

¶ 29    The jury found defendant guilty of first degree murder and further found that he personally discharged a firearm when committing the offense.

¶ 30    Defendant filed a motion for a new trial arguing, *inter alia*, that People's Exhibit 5 was an altered surveillance video enhanced with infrared technology that did not fairly and accurately depict what Gonzalez actually observed. Also, Gonzalez was impeached by two detectives who testified that Gonzalez never told them he saw the shooting. For these reasons, Gonzalez could not lay a proper foundation for admission of the video.

¶ 31    The trial court denied the motion, finding defendant's argument that the infrared camera altered or enhanced the video unsupported by the evidence. It concluded that the fact "a reflective stripe could be seen *** does not equate to altering a video such that it would preclude any kind of admission."

¶ 32    The case proceeded to sentencing. The presentence investigation report (PSI) indicated that defendant was 24 years old at the time of the shooting. He was a former gang member and as an adult had a prior conviction for possession of a controlled substance. Defendant did not have a relationship with his father, and his mother, who suffered from mental health issues, was in and out of jail. He was raised by his grandparents and had a close relationship with his siblings. Defendant also had eight children. He graduated from eighth grade and completed his GED while

incarcerated. At the time of his arrest, he worked at a facility that manufactured car parts. He was diagnosed with bipolar disorder but took medication only while incarcerated.

¶ 33    At sentencing, a police sergeant testified that he observed defendant selling heroin in April of 2013 and found a 9 mm handgun where defendant had been arrested. The State also introduced victim impact statements from Johnathan's sisters and his mother. Defendant presented letters of support from friends, including the mother of his eldest daughter.

¶ 34    The State argued in aggravation that the evidence showed the cold-blooded killing of Johnathan, a stranger to defendant. Defendant's sentence should reflect the need to protect the public from him. In mitigation, defense counsel argued that defendant has strong family support. Counsel also emphasized that defendant was raised without his parents, and he suffered from physical and mental health issues.

¶ 35    Before sentencing defendant, the trial court stated that it reviewed the testimony at trial and considered the statutory factors in aggravation and mitigation, the information presented in the PSI, defendant's letters of support, victim impact statements, and the testimony provided at the sentencing hearing. It discussed each of the statutory mitigating factors and found that none applied. However, the court also elected to consider the factors listed in section 5-4.5-105 of the Unified Code of Corrections (Code) (730 ILCS 5/5-4.5-105 (West 2020)), applicable to individuals under 18 years of age at the time of the offense, even though defendant was almost 25 years old at the time of the offense. Specifically, it found relevant the fact that defendant's father was unavailable, and his mother had mental health issues. Although no evidence was presented regarding defendant's rehabilitation, the court found that "defendant is young and I think there's that potential [for rehabilitation] in virtually every case."

¶ 36    In aggravation, the trial court found that "defendant's conduct caused or threatened serious harm." It also considered the fact that defendant was "out on a bond for the Class X felony offense of armed violence" when Johnathan was shot and killed. The court believed that defendant's sentence in this case may deter "others that are hearing about it."

¶ 37    The case presented the court "with two people who took very different paths about the same age." Johnathan "was coming home from a late shift *** after working helping to support his family and for reasons that still are inexplicable he was ordered to the ground *** and he was executed by" defendant. The trial court found the video of the shooting "chilling, very chilling." After "reviewing all of the factors in aggravation and mitigation," the court sentenced defendant to 40 years in the Illinois Department of Corrections, with a mandatory consecutive term of 25 years for personally discharging a firearm that proximately caused Johnathan's death. Defendant filed a motion to reconsider his sentence, which was denied. This appeal followed.

¶ 38                                II. ANALYSIS

¶ 39    Defendant first contends that the trial court erred in admitting People's Exhibit 5, the video recording of the shooting, where the State failed to establish a proper foundation for the video. Video recordings, like photographs, "may be admitted if properly authenticated." *People v. Taylor*, 2011 IL 110067, ¶ 27. The trial court has discretion to decide whether to admit a video into evidence, and a reviewing court will not disturb that ruling absent an abuse of discretion. *Id.*

¶ 40    With a proper foundation, photographs and video recordings may be admitted as substantive evidence. *Id.* ¶ 32. A proper foundation for a video may be established when "someone having personal knowledge of the filmed object" testifies that "the film is an accurate portrayal of what it purports to show." *People ex rel. Sherman v. Cryns*, 203 Ill. 2d 264, 283-84 (2003); *In re D.Q.*, 2016 IL App (1st) 160680, ¶ 25; *People v. Vaden*, 336 Ill. App. 3d 893, 899 (2003). In

*Vaden*, a videotape was properly authenticated where the officer testified that he personally observed the defendant "walk up to the informant's vehicle, lean his head into the vehicle, have a conversation with the informant and then walk away from the car, all of which is shown on the videotape." *Id.* The officer further testified that the videotape was an accurate portrayal of what he observed. *Id.* Therefore, the trial court's decision to admit the video into evidence was not an abuse of discretion. *Id.*

¶ 41     Like the officer in *Vaden*, Gonzalez testified that he personally observed the events recorded on the video, and that the recording accurately portrayed what he had observed. The trial court thus admitted People's Exhibit 5 based on Gonzalez's testimony.

¶ 42     Defendant argues that Gonzalez could not authenticate the video because it was recorded using infrared technology. He contends that an infrared camera "detects light which the human eye cannot perceive." Consequently, the camera recorded "things that Gonzalez' human eye was not able to detect." Under these circumstances, Gonzalez "could not see what the camera 'saw' " and, as such, he could not authenticate the video.[2]

¶ 43     We disagree that the video in this case portrayed something Gonzalez could not see. Although infrared cameras can record light invisible to the human eye, there is no evidence that the recording in this case contained such images. When authenticating a video, the issue is whether the *film* is an accurate portrayal of what it purports to show. See *Sherman*, 203 Ill. 2d at 283-84. As Gonzalez testified, the video showed exactly what he had observed regarding the shooting.

---

[2]Defendant contends only that the camera's infrared technology improperly enhanced the video recording. He does not argue that People's Exhibit 5 was altered or otherwise enhanced in comparison to the original recording.

¶ 44    Defendant argues that Gonzalez did not notice a block of reflective stripes on the shooter's lower pant leg, a detail captured in the video. These stripes, however, are visible not only in the video recorded by the infrared camera, but also in video recorded without the use of infrared technology. Both the gas station camera and the POD camera captured the reflective stripes. Therefore, the visibility of the stripes in the infrared recording does not indicate an enhancement or alteration that would preclude its admission. The fact that Gonzalez did not notice them is likely attributed to his focus on other details of the shooting, and not to an inability to see the stripes without an infrared camera.

¶ 45    Defendant also argues that Gonzalez could not authenticate the video because his vantage point of the shooting was different from the camera that recorded the video. Gonzalez observed the shooting from across the street "in a southeasterly direction" that was "much farther away than the camera at a time when it was dark." In contrast, the camera that recorded the video was located on the same side of the street and "no more than the length of a front yard away" from the shooting. As support, defendant cites *People v. Rolon*, 71 Ill. App. 3d 746 (1979), and *People v. Jones*, 114 Ill. App. 3d 576 (1983).

¶ 46    In *Rolon*, the defendant questioned the witnesses' ability to observe the shooting from their apartment and sought to admit photographs showing their apartment in relation to where the shooting occurred. *Rolon*, 71 Ill. App. 3d at 750. The appellate court found that the photos were properly excluded because they would have confused and misled the jury. *Id.* at 751. None of the photos showed the vantage point of the witnesses when they viewed the shooting from their apartment. *Id.* Also, the apartment was obscured by trees and foliage which, from the witnesses' testimony, were not in their line of sight when they viewed the shooting. *Id.* Although the shooting occurred at night, the photos were taken during the day resulting in "heavy shading" around the

apartment's windows. *Id*. This shading created "a misleading impression as to the width of a tree in front of" the witnesses' apartment. *Id.* The court determined that "[p]hotographs should not be admitted into evidence unless they are shown to portray certain facts relevant to an issue of the case and are verified as a correct representation of those facts." *Id.* at 751-52.

¶ 47    In *Jones*, the photograph admittedly "did not portray the scene as it would have appeared at 3:15 a.m. on the day of the crime, since it was taken at 12:30 p.m., almost 18 months later." *Jones*, 114 Ill. App. 3d at 590. The photo also portrayed the eyewitness as much farther away from the defendant than on the night of the crime. *Id.* at 591. Therefore, the trial court did not abuse its discretion in excluding the photo because it "[did] not accurately portray the scene as it appeared at the time of the crime." *Id.*

¶ 48    The photographs in *Rolon* and *Jones* were properly excluded because they did not accurately portray the scene as observed by witnesses on the day of the crime. The video in this case, however, was recorded as the crime occurred. As such, it portrayed the crime itself as Gonzalez observed the same scene. Although Gonzalez did not view the crime from the same location as the camera, he testified that the recording accurately portrayed the shooting as he observed it from his vantage point. As a result, the video was admissible even under the standard set forth in *Rolon* and *Jones*. See also *Cryns*, 203 Ill. 2d at 284-85 (noting that a witness who observed the event could establish a proper evidentiary foundation for a video recording of the event if he testified that the video was an accurate portrayal of the event, and the video admitted into evidence was the same video he viewed).

¶ 49    Furthermore, the jury viewed the video which showed Gonzalez walking from his location across the street to speak with the police. As a result, the video did not mislead the jury regarding the distance, or angle, from which Gonzalez observed the shooting. Any issues regarding

Gonzalez's ability to observe the shooting affect the weight and credibility of his testimony, rather than the admissibility of the video. See *People v. Williams*, 2015 IL App (1st) 131103, ¶ 74 ("the witnesses' opportunity to observe what happened goes to the weight and credibility of their testimony"). We find that the trial court did not abuse its discretion in admitting People's Exhibit 5 as evidence.

¶ 50    Since the trial court properly admitted People's Exhibit 5, we need not consider defendant's argument that trial counsel was ineffective for failing to file a motion *in limine* to preclude introduction of the video at trial, or that posttrial counsel was ineffective for failing to raise the ineffective assistance of trial counsel issue in defendant's motion for a new trial.

¶ 51    Defendant next contends that his sentence of 65 years in prison is an improper life sentence that disregards his potential for rehabilitation. He argues that young people often act on impulse because their brains are not fully developed, and they also have a greater potential for rehabilitation compared with older offenders. As such, his "youth alone serves as strong evidence of rehabilitative potential," which the trial court did not sufficiently consider. To support his argument, defendant cites *Miller v. Alabama*, 132 S. Ct. 2455 (2012), *People v. Reyes*, 2016 IL 119271, and *People v. Buffer*, 2019 IL 122327.

¶ 52    *Miller* established that "children are constitutionally different from adults for purposes of sentencing," and are "less deserving of the most severe punishments" because of their "diminished culpability and greater prospects for reform." (Internal quotation marks omitted.) *Miller*, 132 S. Ct. at 2464-65. Therefore, a sentencing scheme "that mandates life in prison without possibility of parole for juvenile offenders" presents "too great a risk of disproportionate punishment," and is forbidden by the eighth amendment. *Id.* at 2469.

¶ 53    In *Reyes*, the defendant was 16 years old when he committed the offense and sentenced to a legislatively mandated term of 97 years in prison with a possibility for release after serving 89 years. *Reyes*, 2016 IL 119271, ¶ 10. Our supreme court found that "[a] mandatory term-of-years sentence that cannot be served in one lifetime has the same practical effect on a juvenile defendant's life as would an actual mandatory sentence of life without parole—in either situation, the juvenile will die in prison." *Id.* ¶ 9. Since the defendant "will most certainly not live long enough to ever become eligible for release," our supreme court determined that his "mandatory, *de facto* life-without-parole sentence" was unconstitutional pursuant to *Miller*. *Id.* ¶ 10.

¶ 54    In *Buffer*, 2019 IL 122327, our supreme court determined that a sentence of more than 40 years in prison for juvenile defendants constitutes "a *de facto* life without parole" sentence in violation of the eighth amendment. *Buffer*, 2019 IL 122327 ¶¶ 40-41. The court chose "to draw a line at 40 years" because the new sentencing statute applicable to "defendants under the age of 18 when they committed their offenses" set a "mandatory minimum sentence of 40 years" for juveniles convicted of first degree murder, and the legislature "evidently believed that this 40-year floor for juvenile offenders *** complies with the requirements of *Miller*." *Id.* ¶¶ 36-37, 39.

¶ 55    In *Miller*, the constitutionality of a life sentence without parole was analyzed in the context of *juvenile* defendants who, due to their young ages, possess "distinctive (and transitory) mental traits and environmental vulnerabilities." *Miller*, 132 S. Ct. at 2465. Likewise, our supreme court in *Reyes* and *Buffer* discussed *de facto* life sentences as they applied to juvenile offenders. The court never considered whether the same constitutional concerns applied to adult offenders like defendant, who was almost 25 years old when he committed the offense.

¶ 56    Our legislature has recognized that young adult defendants between 18 and 20 years old may have diminished culpability in some cases. See 730 ILCS 5/5-4.5-115(b) (West 2020)

(providing that offenders under 21 years of age at the time of the offense shall be eligible for parole review after serving 10 or 20 years of their sentence, depending on the nature of the offense). Defendant, however, was well beyond the applicable age of section 5-4.5-115(b). Moreover, courts have been reluctant to extend *Miller*-based sentencing protections to defendants of his age. See, for example, *People v. Everett*, 2022 IL App (1st) 201169 (23-year-old defendant); *People v. Robinson*, 2021 IL App (1st) 192289 (24-year-old defendant); *People v. Clark*, 2021 IL App (3d) 180610 (24-year-old defendant); and *People v. Suggs*, 2020 IL App (2d) 170632 (23-year-old defendant).

¶ 57    We agree with the State that defendant cannot invoke the sentencing concerns expressed in *Miller*, or the *de facto* life sentence determinations in *Reyes* and *Buffer*, to argue that the trial court did not adequately consider his rehabilitative potential when it sentenced him to a term of 65 years in prison. We now address defendant's contention that his sentence was excessive given his young age at the time of the offense, his difficult childhood, and his potential for rehabilitation.

¶ 58    In determining an appropriate sentence, the trial court considers factors such as "defendant's history, character, and rehabilitative potential, along with the seriousness of the offense, the need to protect society, and the need for deterrence and punishment." *People v. Hernandez*, 319 Ill. App. 3d 520, 528-29 (2001). Having observed the proceedings, the trial court is in a much better position to weigh the relevant sentencing factors. *People v. Alexander*, 239 Ill. 2d 205, 212-13 (2010). Accordingly, a reviewing court gives great deference to the trial court's sentence and will not reverse that determination absent an abuse of discretion. *People v. Butler*, 2013 IL App (1st) 120923, ¶ 30.

¶ 59    After reviewing the testimony at trial, "all of the statutory factors in aggravation as well as mitigation," the PSI, and the evidence presented at the sentencing hearing, the trial court sentenced

defendant to 40 years in prison, plus a mandatory 25 years because defendant personally discharged a firearm that proximately caused Johnathan's death. The minimum total sentence defendant could have received was 45 years, up to a maximum sentence of natural life in prison. See 730 ILCS 5/5-4.5-20(a) and 5/5-8-1(a)(1)(d)(iii) (West 2020). Defendant's sentence of 65 years' imprisonment, which falls within the statutory range, is presumed proper unless it (1) greatly departs from the spirit and purpose of the law, or (2) is contrary to constitutional guidelines. *People v. Burton*, 2015 IL App (1st) 131600, ¶ 36.

¶ 60     Defendant argues that his sentence was "greatly at variance with the spirit and purpose of the law" and failed to reflect Illinois' constitutional objective of restoring defendant to useful citizenship. He contends that his 65-year sentence "leaves no room for rehabilitation whatsoever." Defendant bases his argument, in part, on data showing a life expectancy of 64 years old for federal prisoners. We note that even if defendant had received the minimum sentence allowed under the statute, he would be 69 years old after fully serving his sentence. The trial court could not have imposed a sentence where defendant would leave prison before reaching 64 years of age.

¶ 61     Nonetheless, the record shows that the trial court carefully considered all of the statutory mitigating factors, including the *Miller*-based factors relevant to juvenile defendants. The court noted defendant's childhood with an absent father, and a mother with mental health issues, but also noted defendant's supportive grandparents. The court acknowledged that "defendant is young and *** there's that potential [for rehabilitation] in virtually almost every case." However, it found "no evidence presented of rehabilitation" in defendant's case.

¶ 62     In aggravation, the trial court found that "defendant's conduct caused or threatened serious harm," and that he was "out on a bond for the Class X felony offense of armed violence" when Johnathan was shot and killed. The trial court described the video of the shooting as "chilling, very

chilling." It noted that Johnathan was inexplicably ordered to the ground and "executed" by defendant. The court also believed that defendant's sentence could deter "others that are hearing about it." See *People v. Donath*, 357 Ill. App. 3d 57, 72 (2005) (finding that the need for deterrence and punishment are proper factors to consider when determining a sentence).

¶ 63    "A defendant's rehabilitative potential *** is not entitled to greater weight than the seriousness of the offense." *People v. Coleman*, 166 Ill. 2d 247, 261 (1995). Moreover, we must not substitute our judgment for that of the trial court simply because we would have balanced the appropriate sentencing factors differently. *Alexander*, 239 Ill. 2d at 213. The trial court weighed the proper factors and the sentence it imposed was not " 'greatly at variance with the spirit and purpose of the law, or manifestly disproportionate to the nature of the offense.' " *Id.* at 215 (quoting *People v. Stacey*, 193 Ill. 2d 203, 210 (2000)). Therefore, defendant's 65-year sentence was not excessive, and the trial court did not abuse its discretion in imposing such a sentence.

¶ 64                                III. CONCLUSION

¶ 65    For the foregoing reasons, we affirm the judgment of the circuit court.

¶ 66    Affirmed.